Filed 4/28/14  P. v. Madrigal CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE DEJESUS MADRIGAL,<br><br>    Defendant and Appellant. | H038548<br>(Monterey County<br>Super. Ct. No. SS120184) |

A jury found defendant Jose DeJesus Madrigal guilty on three counts:  Count One—sexual intercourse or sodomy with a child aged 10 or younger; Count Two—lewd or lascivious act with force on a child under 14; and Count Three—lewd or lascivious act on a child under 14.  (Pen. Code, §§ 288.7, subd. (a), 288, subds. (a) & (b)(1).)[1]  The trial court sentenced defendant to a term of 37 years to life.

On appeal, defendant contends the trial court did not adequately instruct the jury that it must unanimously agree on either sexual intercourse or sodomy as a basis for Count One.  Alternatively, defendant argues his trial counsel was ineffective for failing to

---

[1] Subsequent undesignated statutory references are to the Penal Code.

request a clearer unanimity instruction or demanding that the prosecutor specify which act formed the basis for the charge.[2]

We find no error in the trial court's instructions, and we conclude trial counsel's performance was not deficient. We will therefore affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A. *Facts of the Offenses*

Defendant, a 29-year-old farmworker, lived with his eight-year-old niece, L.A., along with numerous other relatives. Those living with them included: (1) Blanca, L.A.'s mother; (2) Griselda, defendant's wife and Blanca's sister; (3) M.E., Griselda's eight-year-old daughter, defendant's step-daughter, and cousin to L.A.; and (4) Lizbeth, Blanca's sister-in-law.[3] They lived in two houses in Castroville during the relevant period. Before March 2, 2011, they lived in a house on Blevins Way. On March 2, they moved to a house on Jackson Street. Five families lived at the house on Jackson Street. L.A. lived in one bedroom with her parents and brother. Defendant, Griselda and M.E. lived in another bedroom.

### 1. *Initial Investigation*

On June 9, 2011, Deputy Sheriff Chad Giraldez went to the Jackson Street house to investigate a possible sexual assault.[4] Deputy Giraldez interviewed L.A. in English. She told him about two incidents in which defendant sexually assaulted her. She first said she was at home with defendant three days earlier, on the afternoon of Monday, June 6, while her mother was at work. She was in her bedroom when defendant entered, and

---

[2] In a separate petition for writ of habeas corpus (*In re Madrigal*, H039632), defendant presents additional claims of ineffective assistance of counsel. By separate order of this date, we deny the petition for habeas corpus.

[3] We will refer to minors by their initials to protect their identities, and to adults by their first names for the same reason. We intend no disrespect.

[4] The record is not clear as to how Deputy Giraldez learned of the assault. He testified only that he was dispatched to a possible sexual assault in Castroville.

2

removed her pants and underwear. He attempted to kiss her on the mouth, but she kicked at him, and he did not kiss her. L.A. said defendant put his "private parts" on her "private parts." When Deputy Giraldez asked her what she meant by her "private part," she pointed to her crotch area and said "in the front." She said defendant's "private part" was his penis. She then changed "on" to "in," stating that defendant's erect penis went *in* her "front private area."

L.A. then told Deputy Giraldez about a second incident that had happened two weeks before. His report recorded the date of the incident as May 25, 2011. L.A. said defendant forced her into his bedroom, and that his penis "went in her front private area."

Valerie Barnes, a pediatrician and an expert in child abuse, performed a forensic medical examination of L.A. at the Bates-Eldridge Clinic in Salinas on June 22, 2011. Dr. Barnes testified that L.A. said she was lying on her bed watching television when defendant entered her room, pushed her back on the bed, climbed on top of her, and put his "front part into my part." L.A. also said defendant put his finger inside her anus, causing pain. L.A. said this happened on a Monday three weeks prior to the examination. Dr. Barnes conducted a physical examination of L.A.'s genital and anal areas but found nothing abnormal.

On cross examination, Dr. Barnes testified that L.A. said defendant had sexually abused her in three incidents on three separate days, and that the first incident occurred three weeks prior to the examination, on a Monday afternoon. L.A. said there had been no penile-anal contact. L.A. said that on all three occasions, defendant penetrated her "front private part" with his "front private part." L.A. said she never saw any "white stuff" come out of defendant's "front private part." L.A. said nobody else saw these incidents, and defendant never told her not to tell anyone about them.

### 2. *L.A.'s Testimony at Trial*

At the time of her trial testimony, L.A. was nine years old. She testified to several incidents in which defendant sexually molested her.

3

*i. Direct Examination—Testimony About The "Sponge Bob" and "The Incredibles" Incidents at the House on Jackson Street*

In the most recent incident, L.A. was lying by herself on her mother's bed watching "Sponge Bob" on the television.  Defendant walked into the bedroom, pulled her by the waist, and pulled her pants down.  His hand was touching her "back private part."  Defendant then "put his private part" on L.A.'s "back private part."  On further questioning, L.A. testified that defendant put his "front private part" *into* her "back private part" for about five minutes.  She did not see his private part, but she could feel it.  L.A. tried to move her waist to the side to get him to "take it off."  Defendant stopped and left the room when Griselda called him on the telephone.  Defendant told her not to tell anybody about the incident.  L.A. could not remember if anybody saw this incident.

L.A. then testified about another incident of molestation.  She and M.E. were lying on Griselda's bed watching "The Incredibles" on the television.  L.A. was under the covers, and M.E. was lying in front of her.  Defendant came into the bedroom and lay down on the bed behind L.A.  While L.A. was under the covers, defendant pulled down her pants and underwear.  He then put his "front private part" into her "back private part" for about five minutes.  She later testified that defendant stopped when Griselda walked into the room.

These were the only two incidents about which L.A. testified on direct examination; she could not recall any other "bad-touch" incidents.  She testified that defendant offered her $5 not to tell anybody about the incidents.  She further testified that defendant once kissed her on the mouth while she was watching television in the living room.  He stopped when Lizbeth walked in from the hallway.  On another occasion, defendant offered her $20 to come into his room, but she refused.

*ii. Cross Examination—Testimony About Incidents at the House on Blevins Way*

On cross examination, L.A. testified about what she told Deputy Giraldez when he interviewed her in June 2011.  She testified that she told Deputy Giraldez about an

4

incident several weeks prior to the interview, when the family lived at the previous house on Blevins Way. She admitted that she told Deputy Giraldez that defendant had put his "front part" into her "front part." She also admitted that in May 2011 she told a social worker that defendant had put his "front part" into her "front part." She testified that in one of the incidents, she saw "white stuff" come out of defendant's "front part." She admitted that she had previously told investigators that defendant's "front part" touched her "front part," but that it did not go inside. She also admitted that two months before trial, she told an investigator that the only "bad touch" occurred when defendant's "front part" touched her "front part." She further admitted that she had previously told a defense investiga+tor that defendant put his "front part" inside her "front part," and that she saw "white stuff" come out of defendant's "front private part."

### iii. *Redirect Examination—Testimony About Additional Incidents*

On redirect examination, L.A. testified about another incident of molestation in which she and M.E. were watching television on the bed in Griselda's room when defendant came in. He lay down on the bed behind L.A. while M.E. was in front of her. L.A. was under the covers. When M.E. left the room to get a drink, defendant put his "front private part" on L.A.'s "front private part." On further questioning as to where defendant put his "front private part," L.A. said he put it "*In* my front private part." (Italics added.) L.A. clarified that this incident was distinct from the prior incident in Griselda's bedroom when M.E. was lying on the bed and defendant put his "front private part" inside her "back part."

L.A. then testified about another incident that occurred when she was alone in her bedroom watching television. She was standing on the floor when defendant came into the room, pulled her pants down, and tried to put his "front private part" into her "front private part." She did not see his "private," but she could feel it. She tried to fight back by pulling away and moving to the side. He did not go inside her, but the skin of his "private" touched her "private."

5

On further redirect examination, L.A. testified about an incident in which she saw something come out of defendant's "front private part." She testified that she was in her room watching television when defendant came into the room and tried to put his "front private part" on her "back private part." Something came out of his "front private part" and he left, whereupon L.A. pulled up her pants and cleaned up. L.A. then testified about another incident when she was in a bedroom with M.E. Defendant came in, pulled L.A.'s pants down, and put his fingers into her "back private part."

3. *Other Witnesses' Testimony at Trial*

M.E. also testified for the prosecution. She was nine years old at the time of the trial. She testified about an incident she witnessed at the house on Jackson Street, but she could not recall when it happened. M.E. was standing at the door of Blanca's bedroom, looking into the room. She saw L.A. and defendant in the bedroom, and she heard L.A. crying. L.A. was on the corner of the bed, pushing against defendant with her hands. Defendant was on his knees on the floor in front of her, grabbing at her arms. It looked like defendant was giving L.A. a hug. M.E. heard L.A. say, "Leave me alone." Defendant was wearing shorts. At first, M.E. testified that his shorts were the kind "you can wear outside," but she then said they were boxer shorts. M.E. also testified that defendant would, at times, lie down on the bed and watch television with L.A. and M.E. in Griselda's bedroom. M.E. would sit closest to the television, L.A. would sit behind her, and defendant would sit behind L.A. They would get under the covers when it was cold.

Lizbeth, Blanca's sister-in-law, testified that she once saw L.A. and defendant sitting on a bed in the living room when defendant grabbed L.A. and kissed her on the cheek. Defendant had his hand on L.A.'s leg. Lizbeth told her husband about the incident.

Griselda, defendant's wife at the time of the incidents, testified that L.A. told her that defendant sexually abused L.A. in June 2011. Griselda spoke with Blanca about the

6

incident and they took L.A. to a clinic in Watsonville. Griselda also testified about an incident at the house on Blevins Way when she witnessed defendant lying on the bed in her bedroom with L.A. and M.E. M.E. was lying in front, with L.A. behind her, and defendant behind L.A. They were lying under the covers, which seemed odd to Griselda because defendant never used a blanket at night, and it was a hot afternoon. Griselda asked both girls if defendant had ever "tried to touch them in a bad way," but they both said no.

On June 8, 2011, Griselda asked defendant if he had sexually abused L.A. Defendant said he did not, but he said he had paid L.A. $50 to tell Griselda that he had molested L.A. Defendant claimed he wanted to determine how much Griselda trusted him, and whether she would call the police or go to him first. Defendant also claimed he had recorded his conversation with L.A., but he said he had accidentally erased it. Griselda testified that she never saw defendant "do any bad touching towards any child."

### 4. *Deputy Giraldez's Interview With Defendant*

Deputy Giraldez interviewed defendant at a supermarket in Castroville on June 14, 2011. Defendant denied having any sexual contact with L.A., but said he engaged in "playful touching" with her, such as tickling and wrestling. Defendant said L.A. had seen various sex acts in an adult program on Playboy TV and she asked defendant about it. Defendant instructed L.A. to tell his wife, Griselda, that he and L.A. had engaged in those acts. Defendant explained that he had "trust issues" with his wife, and he wanted to see if she would come to him first or if she would go to Blanca. Defendant said he was not thinking about the consequences and that "his head was not right."

### 5. *Defense Evidence*

The defense called Vicky Rodriguez, defendant's investigator, to testify about her interview of L.A. in August 2011. L.A. told Rodriguez about four incidents of molestation—three at the house on Jackson Street in July 2011, and a prior incident at the house on Blevins Way. Rodriguez testified that L.A. said defendant put his "private part"

7

*on* her "private part," and then said his "private part" was *outside* her "private part." L.A. never said defendant's "private part" went *in* her "private part," front or back. However, L.A. described seeing "white stuff" come out of defendant's "private part" on two occasions.

Christina Gunter, an investigator for the prosecutor, also testified for the defense. She interviewed both L.A. and M.E. in February 2012. M.E. told Gunter about an incident in which defendant, while standing on the floor, was on top of L.A., who was lying on a bed. L.A. was on her back, pushing defendant with her hands, and telling him to get away. M.E. used the word "hug" in describing the incident. Defendant's hands were on L.A.'s upper arms.

L.A. described two incidents to Gunter. In one incident, L.A. was on the bed watching television when defendant entered the room, and pulled her underwear and pants down. L.A. tried to get away, and made it to the floor, but defendant held her at the waist. Gunter asked L.A. about the description of the incident set forth in Deputy Giraldez's report. L.A. corrected part of the report by clarifying that defendant's "front part" did not go in her "front part," but that he had tried to put it in, and it touched the outside of her "front part." L.A. was moving sideways in an attempt to prevent the penetration. In the second incident, L.A. and M.E. were on the bed in M.E.'s room watching television. Defendant pulled L.A.'s underwear and pants down, and his "front part" went into her "back part," "where she goes poo."

B. *Procedural Background*

On February 17, 2012, the prosecution charged defendant by information with three counts: Count One—sexual intercourse or sodomy with a child aged 10 or under (§ 288.7, subd. (a)); Count Two—lewd or lascivious act with force on a child under 14

8

(§ 288, subd. (b)(1)); and Count Three—lewd or lascivious act on a child under 14 (§ 288, subd. (a)).[5] The case went to trial in April 2012.

### 1. *Closing Argument*

In closing argument, the prosecutor explained the elements required for Count One and told the jury they had to be unanimous with respect to the required act: "Here is the trick in this case: You're going to have one count of 288.7. *You're going to have to be unanimous, absolutely unanimous, on whether it's intercourse or sodomy.* You can find him guilty of both. You can think that can happen a lot of times, but you're going to be asking—we're asking you once, just one time, did one or the other happen? And I'm looking for a verdict of guilty on this charge of either sodomy or intercourse. You've got to be unanimous. You may agree that it happened multiple times, it both happened multiple times, that's okay. So you're wondering in the jury deliberation room why you're only being asked once, it's because that's what we're asking for."

The prosecutor then set forth the evidence according to the rooms in which the incidents occurred and the television shows the victim was watching at the time. First, he described the incident in L.A.'s bedroom, which she shared with her mother, Blanca. L.A. was lying on the bed alone, watching Sponge Bob on television, when defendant entered the room, pulled her pants down, and put his "private part" into her "private part," "where the poo comes out." The prosecutor argued this incident, which he referred to as "the Sponge Bob event," constituted sodomy.

The prosecutor then described the evidence relating to "the Incredibles incident," which occurred when L.A. and M.E. were in Griselda's bedroom lying on the bed while watching the Incredibles on television. While defendant was lying on the bed behind

---

[5] All three offenses were alleged to have occurred on or about June 6, 2011. At the close of the prosecution's case, the trial court amended the information to extend the applicable time period from January 2011 to June 2011.

9

L.A., he pulled her pants down and put his "front private part" into her "back private part." The prosecutor argued this constituted a second act of sodomy.

The prosecutor then described the evidence of a third incident wherein L.A. and M.E. were watching television in Griselda's bedroom when defendant came into the room. When M.E. left the room to get a drink, defendant put his "front private part" in L.A.'s "front private part." The prosecutor argued that this constituted sexual intercourse. The prosecutor reiterated that the evidence supported two incidents of sodomy—"the Sponge Bob event" and "the Incredibles incident"—and one incident of sexual intercourse.

Next, the prosecutor described the incident wherein L.A. was standing on the floor alone in her bedroom when defendant entered the room, pulled her pants down, and tried to put his "front private part" into her "front private part." Because L.A. resisted by moving sideways, defendant did not penetrate her. The prosecutor argued that this constituted a forcible lewd act, providing the basis for a conviction on Count Two. The prosecutor also argued that the two sodomy incidents and the sexual intercourse incident, each being a lewd and lascivious act, could form the basis for a conviction on Count Three.

### 2. *Jury Instructions*

The trial court used CALCRIM No. 1127 to instruct the jury on the elements of Count One, sexual intercourse or sodomy with a child aged 10 or younger. As relevant here, the court instructed the jury, "the People must prove that, one, the defendant engaged in an act of sexual intercourse or sodomy with [L.A.]." The court defined sexual intercourse and sodomy separately, and stated, "In order to find the defendant guilty of this crime, you must all agree as to which act constitutes the crimes." The court also instructed the jury with CALCRIM No. 3501, a unanimity instruction: "The People have presented evidence of more than one act. To prove that the defendant committed these offenses, you must not find the defendant guilty unless, one, you all agree that the People

10

have proved that the defendant committed at least one of those acts, and you all agree on which act he committed for each offense. Or, two, you all agree that the People have proved that the defendant committed all the acts alleged to have occurred during that time period."

In deliberations, the jury sent a note to the court requesting, "Can you please clarify for the verdict sheets whether or not if we need to write on the verdict sheets the actual act/event for each count charged." The court responded, "You do not specify the actual act/event on the verdict forms."

The jury convicted defendant on all counts. The trial court sentenced defendant to a term of 37 years to life, composed of 25 years to life on Count One, 10 years on Count Two, and two years on Count Three, to run consecutively.

## II. DISCUSSION

Defendant contends the trial court did not adequately instruct the jury that it must unanimously agree on whether the conviction on Count One for violating section 288.7, subdivision (a) was based on sexual intercourse or sodomy. Defendant also complains that the trial court erroneously instructed the jury on both sodomy and sexual intercourse. Under defendant's interpretation of the given instructions, the jury could have convicted him without unanimously agreeing whether he committed sodomy or sexual intercourse. Alternatively, defendant argues that his trial counsel was ineffective for failing to request a clearer unanimity instruction or demanding that the prosecutor specify which act formed the basis for the charge.

A. *Adequacy of the Unanimity Instructions*

Criminal defendants have the right to a unanimous jury verdict under the California Constitution. (Cal. Const., art. I, § 16; *People v. Russo* (2001) 25 Cal.4th 1124, 1132; *People v. Jones* (1990) 51 Cal.3d 294, 321.) Furthermore, "It is established that some assurance of unanimity is required where the evidence shows that the defendant has committed two or more similar acts, each of which is a separately

11

chargeable offense, but the information charges fewer offenses than the evidence shows."
(*People v. Sutherland* (1993) 17 Cal.App.4th 602, 611-612.) In these circumstances, jurors must unanimously agree the defendant is "criminally responsible for '*one discrete criminal event.*' " (*People v. Thompson* (1995) 36 Cal.App.4th 843, 850, original italics.) Generally, when the accusatory pleading charges a single criminal act, and the evidence shows more than one such act, the prosecution must select the specific act proving the charge, *or* the jury must be instructed it cannot convict without unanimous agreement on which act the defendant committed. (*Ibid.*)

Here, the prosecutor did not select one act as the basis for Count One. To the contrary, the prosecutor argued that the jury could convict defendant on Count One on the basis of any one of three acts—two acts of sodomy, and one act of sexual intercourse. Thus, the trial court was required to give a unanimity instruction. With respect to Count One, the trial court did so twice.[6] First, immediately after giving the instructions defining sodomy and sexual intercourse, the court told the jury, "you must all agree as to which act constitutes the crimes." Subsequently, the court also gave a general unanimity instruction that hewed closely to the standard CALCRIM 3501 instruction, which is applicable in cases where the victim describes multiple similar acts of molestation by the defendant. (*People v. Jones*, *supra*, 51 Cal.3d 294, 321.)

Defendant contends it is unlikely the jury understood they were required to agree whether the act forming the basis for Count One was sodomy or sexual intercourse. Instead, defendant argues, the jury may have believed they only had to agree on which of the several sexual assaults or factual scenarios constituted the basis for Count One. We find no merit in this argument.

First, the court gave the initial unanimity instruction immediately following the separate definitions of sodomy and sexual intercourse. The most natural interpretation of

---

[6] The court also instructed the jury on unanimity as to Counts Two and Three, as well as the lesser included charges of simple battery for each of the three counts.

12

the court's reference to an "act" in that instruction—specifically, the phrase "which act constitutes the crime"—is that the court was referring to the acts it had just defined. The prosecutor anticipated and underscored this interpretation in his closing argument when he told the jury, "You're going to have to be unanimous, absolutely unanimous, on whether it's intercourse or sodomy." Furthermore, we presume the jury followed the plain meaning of the instruction—which refers to an *act*, not an incident or date. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 ["Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions."].) We find no evidence or showing that the jury was confused in the manner defendant contends they were.

As to defendant's argument that the court erred by instructing the jury as to both sodomy and sexual intercourse, we reject this contention as well. The plain language of the statute allows for conviction on the basis of either sodomy or sexual intercourse. Based on the evidence on the record, either act could have formed the basis for a conviction under the statute, so the court was required to instruct the jury with both definitions. Provided the court also instructed the jury that it must unanimously agree on the underlying act—as the court did—there was no danger of an improper conviction. Accordingly, we find defendant's claim without merit.

B. *Ineffective Assistance of Counsel*

Defendant argues his trial counsel provided ineffective assistance of counsel by failing to request a clearer unanimity instruction or demanding that the prosecutor specify which act formed the basis for the charge.

"To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Prejudice exists where there is a reasonable probability

13

that, but for counsel's errors, the result of the proceeding would have been different." (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694 (*Strickland*).) " 'Finally, prejudice must be affirmatively proved; the record must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) "It is the defendant's burden on appeal [. . .] to show that he or she was denied effective assistance of counsel and is entitled to relief. [Citations.] '[T]he burden of proof that the defendant must meet in order to establish his [or her] entitlement to relief on an ineffective-assistance claim is preponderance of the evidence.' [Citation.]" (*In re Hill* (2011) 198 Cal.App.4th 1008, 1016.)

We find trial counsel's performance was not deficient. Because the trial court adequately instructed the jury on the unanimity requirement, counsel had no grounds for objecting or requesting a more specific instruction. And because the trial court instructed the jury on unanimity, the prosecutor was not required to select a single act as the basis for the charge. (*People v. Thompson*, *supra*, 36 Cal.App.4th at p. 850.) Any objection by trial counsel would have been properly overruled. He therefore did not violate any standard of reasonableness under professional norms. (*People v. Price* (1991) 1 Cal.4th 324, 387 [counsel does not render ineffective assistance by failing to make motions or objections reasonably determined to be futile].)

Finally, even if trial counsel could have successfully argued for a more specific unanimity instruction, defendant has made no showing of prejudice. For these reasons, we find defendant's claim of ineffective assistance of counsel without merit.

### III. DISPOSITION

The judgment is affirmed.

14

_____
Márquez, J.

WE CONCUR:

_____
Elia, Acting P. J.

_____
Bamattre-Manoukian, J.

15