[No. C018094. Third Dist. July 13, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES ROYCE THOMPSON, Defendant and Appellant.

COUNSEL

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant And Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Margaret G. Venturi and John G. McLean, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

**MORRISON, J.**—Defendant was convicted by jury of diversion of construction funds (Pen. Code, § 484b) and petty theft (Pen. Code, § 488). The court struck the theft count and granted defendant probation. On appeal defendant contends there were several instructional errors. We find the

failure to give a unanimity instruction when defendant offered differing defenses to various acts that could constitute diversion was prejudicial error. We reverse the judgment.

## Factual and Procedural Background

Robert and Sharon Riddle acquired some property in Alta Sierra in Nevada County on which they planned to build a house. At the time they lived 400 miles away in Southern California. They saw a house defendant had built in the area and were impressed. After meeting with defendant, the Riddles entered into three different construction contracts with him.

The first contract was to build an aircraft hangar on the property. The Riddles were satisfied with the hangar. Next the Riddles contracted with defendant for construction of a foundation for a house. Again, the Riddles were satisfied with defendant's work.

The Riddles and defendant then entered into a contract to build a house. The contract was dated August 8, 1989. The contract price was $195,000 and the contract provided for payment as follows: "Material as due: labor bi-weekly."

Defendant worked on the construction with his good friend, Mike Verbeke, a carpenter. Verbeke was paid $15 an hour for his labor. Defendant worked about 80 percent of the time that Verbeke worked on the Riddle house. Two students also worked with them. Defendant sent the Riddles invoices periodically. The Riddles made payments to defendant by check; the checks were made out either to defendant alone or to defendant and a supplier.

In December 1989, defendant took a full-time job as an inspector. He told the Riddles he would continue to work on their house in the evenings and on weekends. At about the same time, Verbeke left for another job. Defendant was behind in his payments to Verbeke for his labor on the Riddles' house; the total amount defendant owed Verbeke was $2,570.

In January 1990, defendant told the Riddles the house would be completed in April. There were problems; workers were not paid, and suppliers were not paid and they filed liens on the Riddle property. The Riddles finally terminated the contract in June. An inspection in August concluded the house was only 60 percent complete.

The Riddles believed that they had paid more than they should have for the progress on the house. They thought defendant had stolen from them by

taking money for work he did not do and paying suppliers for amounts due on other jobs. A grand jury indicted defendant on charges of diversion of construction funds and grand theft.

Defendant entered a conditional plea of no contest to the charges. The conditions included dismissal of the theft charge, probation, and restitution to the Riddles of $40,000. The Riddles requested $196,086.21 in restitution and the district attorney objected to the amount of restitution in the conditional plea. Defendant withdrew his plea and the case proceeded to trial.

Defendant moved to have the court interpret the construction contract as a question of law and find defendant was entitled to wages. The court ruled the contract was ambiguous and since there was conflicting extrinsic evidence, the jury should decide the question.

Three experts testified at trial about construction contracts. Frank Dato testified there were two basic types of construction contracts: a fixed price contract and a time and materials contract. The latter usually included a 15 percent profit margin and might have a cap. He opined the Riddle contract was a fixed price contract. He testified in a fixed price contract the contractor could be paid through an agreement with the owner or through a voucher system; otherwise it was not common for the contractor to pay himself. Draws to the contractor were usually tied to completion of certain stages of the job. Absent an agreement with the owner, the term labor in a contract did not include the contractor's labor.

Fred Lopez, who worked at the Contractor's State License Board, also testified the Riddle contract was a fixed price contract. He interpreted the reference to labor in the contract to mean only that of defendant's employees. Lopez testified contractors should have working capital of at least $25,000, but acknowledged small contractors rarely did and used money from draws to live on. In a fixed price contract, the amount of the draws was not tied to the amount of labor the contractor had performed.

Defendant's expert, Robert Berrigan, had previously been program manager for licensing at the Contractor's State License Board. He disputed that contractors were required to maintain any level of operating capital. He testified the Riddle contract was a time-and-materials contract with a fixed price. He believed the term labor in the contract did not exclude the contractor's labor. In a fixed price contract with draws, the contractor could take funds for his own benefit. Berrigan had never seen a contract for construction of a house where the contractor did not get paid until the end.

Robert Riddle testified defendant told him several times that he was not taking a penny for himself under the contract. He testified defendant never

told him he would charge for his labor, but Riddle also said he understood defendant would be paid at the time if he provided labor on the project.

Sharon Riddle testified she first spoke with defendant about a dumbwaiter in September 1989. He did not know where to get one, so Sharon found a company that sold them and sent defendant brochures. Defendant sent the Riddles an invoice for $4,000, part of which was to be used to purchase the dumbwaiter. The Riddles sent defendant a check for $4,000. Later defendant told Sharon he had purchased the dumbwaiter and it was in his garage. She asked defendant about the dumbwaiter many times, but never saw it. She contacted the company and was told they had never spoken to defendant. Finally, she purchased a dumbwaiter for $1,700.

The credit manager for Caseywood, a lumberyard, testified defendant purchased materials for the Riddle house on his account. Defendant also owed money from previous jobs. The checks Caseywood received from the Riddles did not always match the amount of invoices on their project. When Caseywood received checks for more than was due on the Riddle job, the credit manager contacted defendant who told her to apply the balance to older invoices from other jobs. She testified she discussed applying the excess to older accounts with defendant and would not have done so without his approval.

Verbeke had an account at Hansen Brothers, a concrete ready mix delivery company. Both Verbeke and defendant used the account for the Riddle job. Prior to that job Verbeke had a balance of $4,193.64 on his account. The credit manager testified it was their practice to apply payments as instructed; if there was no instruction, the payment would be applied to the oldest balance. When she received payments from the Riddles, the payment was first applied to the Riddle invoices and the remainder to older jobs. For example, Hansen Brothers received a $7,377.50 payment in August 1988 from the Riddles; only $6,547 was applied to the Riddle job and the remainder to other invoices. The credit manager testified she must have been instructed to apply it to the current Riddle invoice. She also said defendant would not receive notice of how the payment was applied.

A certified public accountant had reviewed defendant's bank records from May 1989 through April 1990. She testified defendant deposited $50,975.34 from the Riddles. She assumed all expenditures were for the Riddle job unless there was evidence to the contrary. She found $19,455.28 in defendant's account had not been spent on the Riddle job. She also calculated that if defendant worked 80 percent of the time Verbeke worked and was paid $20 an hour, there was still $7,479.28 not attributable to defendant's labor that was not spent on the Riddle job.

Defendant testified he never intentionally took "money for nothing" and that the money he spent for personal items was payment for his labor. He measured the amount of those payments by the progress on the job, just as he had done for 10 years. He testified he never inquired about Caseywood's bookkeeping system and could not recall ever telling Caseywood to apply payments to older balances; he testified he simply paid on the account from time to time. He was not aware Caseywood applied Riddle payments to other jobs. He was also not aware that Hansen Brothers applied Riddle payments to other jobs.

Defendant admitted he had received money to purchase the dumbwaiter, but he did not purchase it. He explained that he called the factory and told them he was in the framing stage. The woman he spoke to told him the dumbwaiter should not be installed until after the drywall. He determined there was no point in ordering the dumbwaiter and having it on the job for two or three months, so he called Sharon and told her he would take the money as a labor draw. He denied he ever told Sharon the dumbwaiter was in his garage.

In closing argument, the prosecution directed the jury's attention to "several areas" in determining whether defendant had diverted construction funds. First, defendant received money to purchase a dumbwaiter, but never purchased it. The prosecutor argued Sharon's version of events was the more credible. Second, defendant invoiced the Riddles for amounts in excess of that due Caseywood. He then told Caseywood to apply the excess to other jobs. The prosecutor claimed defendant invoiced the Riddles for $1,500 more than was due. Third, defendant also overbilled the Riddles for amounts due Hansen Brothers and again used the excess, which the prosecutor identified as $1,200, to pay off other jobs. Fourth, defendant used some of the proceeds of the checks from the Riddles for personal expenses. The prosecutor argued defendant was not entitled to draws or payments for his labor under the contract, and even if he was, there was still $7,000 unaccounted for.

The defense requested a unanimity instruction and argued the jury must agree on which acts defendant committed. No such instruction, however, was given to the jury.[1] The jury was instructed it could consider only the acts concerning the dumbwaiter for the theft charge.

The jury received the case on the sixth day of trial and deliberated for about three days, at one point declaring it had reached an impasse. The jury

---

[1] A handwritten note on the rejected instruction, apparently written by the judge, reads: "Not given only one act given to the jury." The record does not reveal whether the unanimity instruction was requested only with respect to the theft charge.

850

asked for a reading of the testimony of the Caseywood credit manager and Sharon's testimony about the dumbwaiter. The jury also asked about diversion and later about the specific intent necessary for theft. Finally, the jury reached a verdict. It found defendant guilty of felony diversion of construction funds, not guilty of grand theft, and guilty of petty theft.

Defendant moved for a new trial. In part, the defense questioned the petty theft conviction, since the evidence about the dumbwaiter was that it cost $1,700, well over the $400 threshold for grand theft. The defense argued the jury either did not have clear guidance or it reached a compromise verdict. The court was "bothered" by the theft count and the inconsistency; it denied the motion for a new trial and struck the theft count.

Defendant was granted probation, with a fine and a penalty. The parties waived a restitution hearing and stipulated to $10,000 in restitution.

## DISCUSSION

■ Defendant contends the trial court erred in failing to instruct the jury it had to agree unanimously on the criminal act or acts defendant committed. Defendant proposed CALJIC NO. 17.01, which the trial court rejected.[2]

■ "It is fundamental that a criminal conviction requires a unanimous jury verdict (Cal. Const., art. I, § 16; *People* v. *Wheeler* (1978) 22 Cal.3d 258, 265 [])." (*People* v. *McNeill* (1980) 112 Cal.App.3d 330, 335 [169 Cal.Rptr. 313].) What is required is that the jurors unanimously agree defendant is criminally responsible for "*one discrete criminal event.*" (*People* v. *Davis* (1992) 8 Cal.App.4th 28, 41 [10 Cal.Rptr.2d 381], original italics.) "[W]hen the accusatory pleading charges a single criminal act and the evidence shows more than one such unlawful act, *either* the prosecution must select the specific act relied upon to prove the charge *or* the jury must be instructed in the words of CALJIC No. 17.01 or 4.71.5 or their equivalent that it must unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act." (*People* v. *Gordon* (1985) 165 Cal.App.3d 839, 853 [212 Cal.Rptr. 174], fn. omitted, original italics.)

[2]CALJIC No. 17.01 provides: "The defendant is accused of having committed the crime of ___ [in Count ___]. The prosecution has introduced evidence tending to prove that there is more than one [act] [or] [omission] upon which a conviction [on Count ___] may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he] [she] committed any one or more of such [acts] [or] [omissions]. However, in order to return a verdict of guilty [to Count ___], all jurors must agree that [he] [she] committed the same [act] [or] [omission] [or] [acts] [or] [omissions]. It is not necessary that the particular [act] [or] [omission] agreed upon be stated in your verdict." (CALJIC No. 17.01.)

The crime of diversion of construction funds is committed by receiving money for the purpose of obtaining or paying for services, labor, materials or equipment and willfully failing to apply such money for those purposes either by failing to complete improvements for which the funds were provided or by willfully failing to pay for services, labor, materials or equipment incident to the construction, and wrongfully diverting the funds to another use than that for which they were provided. (Pen. Code, § 484b.)

Here, the prosecution did not elect a specific act upon which it relied to prove the diversion of construction funds. Instead, in closing argument the prosecutor directed the jury to four different "areas." The Attorney General argues no unanimity instruction was required because this case falls within the continuous conduct exception to the unanimity rule.

A unanimity instruction is not required where the offenses are so closely connected to form a single transaction or where the offense itself consists of a continuous course of conduct. (*People* v. *Diedrich* (1982) 31 Cal.3d 263, 282 [182 Cal.Rptr. 354, 643 P.2d 971].) Offenses which are continuous in nature are failure to provide, child abuse, contributing to the delinquency of a minor, driving under the influence, and the like. (*People* v. *Madden* (1981) 116 Cal.App.3d 212, 218 [171 Cal.Rptr. 897].) "The 'continuous conduct' rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them. [Citation.]" (*People* v. *Stankewitz* (1990) 51 Cal.3d 72, 100 [270 Cal.Rptr. 817, 793 P.2d 23].)

In *People* v. *Daniel* (1983) 145 Cal.App.3d 168 [193 Cal.Rptr. 277], the defendant was convicted of one count of grand theft by embezzlement in an amount exceeding $25,000. The embezzlement occurred over a five-month period. The court rejected defendant's contention that the court was required to give a unanimity instruction *sua sponte*. (*Id.* at p. 175.) The charge alleged defendant had engaged in a continuous course of conduct over a period of five months with a single fraudulent intent or objective and the case was prosecuted and defended on this theory. None of the individual acts amounted to $25,000, so the jury must have concluded defendant did engage in a single continuous course of conduct. In these circumstances, it was highly unlikely there could have been juror disagreement. (*Ibid.*)

This case is distinguishable from *People* v. *Daniel, supra*, 145 Cal.App.3d 168. The indictment did allege a continuous course of conduct; it alleged that between July 7, 1989, and May 30, 1990, defendant obtained money for services and materials, unlawfully failed to apply such money to those purposes, and wrongfully diverted the money to another use. The

amount diverted was in excess of $1,000. In trying the case, however, the prosecutor distinguished between the various methods defendant allegedly used to divert money: overbilling and applying the excess to other accounts; accepting money and not purchasing the dumbwaiter; and taking money for personal use. Each of these methods involved amounts over $1,000, so the jurors need not have found a continuous course of conduct to convict defendant. The defense rejected the continuous conduct theory, arguing the jurors had to agree on the specific act. Furthermore, defendant offered different defenses. He claimed he did not know the amounts paid to suppliers were misapplied; he used the dumbwaiter funds for another legitimate use; and he was entitled to his personal draws.

This case is similar to *People* v. *Laport* (1987) 189 Cal.App.3d 281 [234 Cal.Rptr. 399], in which the defendant was charged with committing grand theft between April 1983 and June 1984. The evidence showed defendant, business manager for an art gallery, embezzled $18,000 by writing checks to herself and stole paintings worth over $5,000. The defense was that defendant believed she was entitled to the checks because of her intimate relationship with the gallery owner and she took the paintings home to show a client. On appeal defendant challenged the failure to give a unanimity instruction. (*Id.* at p. 282.)

The appellate court rejected the People's argument that *People* v. *Daniel*, *supra*, 145 Cal.App.3d 168, applied because defendant's embezzlement, from the same location and the same victim, with the same intent to steal, was a single course of conduct. Unlike the defendant in *Daniel*, the *Laport* defendant used dissimilar means of committing theft and offered different defenses. The different defenses raised the problem the unanimity instruction was designed to prevent. Some jurors could have believed Laport committed theft by writing the checks and others could have believed she stole the paintings, thus they all could have found her guilty without agreeing on the act she committed. (*People* v. *Laport*, *supra*, 189 Cal.App.3d at pp. 283-284.)

The same problem is present here. Some jurors could have believed defendant wrongfully misdirected funds to pay other accounts with suppliers, others could have believed he misused the money for the dumbwaiter, and others could have believed he wrongfully took money for himself. Absent a unanimity instruction, the jurors could have unanimously convicted defendant of diversion without agreeing on what he did.

The Attorney General argues any error in failing to give the unanimity instruction was harmless because this case was essentially a credibility

contest and the jury simply rejected defendant's version of events. ■ Failure to give a unanimity instruction is governed by the harmless error standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]), which requires the error to be harmless beyond a reasonable doubt. (*People* v. *Deletto* (1983) 147 Cal.App.3d 458, 471 [195 Cal.Rptr. 233].)

Where the record provides no rational basis, by way of argument or evidence, for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that defendant committed all acts if he committed any, the failure to give a unanimity instruction is harmless. (*People* v. *Deletto*, *supra*, 147 Cal.App.3d at p. 473.) Where the record indicates the jury resolved the basic credibility dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence, the failure to give the unanimity instruction is harmless. (*People* v. *Jones* (1990) 51 Cal.3d 294, 307 [270 Cal.Rptr. 611, 792 P.2d 643].)

■ We cannot say this is such a case. The different defenses gave the jury a rational basis to distinguish between the various acts. "This is not a case where the jury's verdict implies that it did not believe the only defense offered." (*People* v. *Diedrich*, *supra*, 31 Cal.3d 263, 283.) In *Diedrich*, a former public official defended himself against a bribery charge by simply denying the first act and "explaining" the second. The court found the failure to give a unanimity instruction was prejudicial error. (*Ibid.*) Here, defendant denied he diverted funds for his personal use, explained he used the dumbwaiter funds for another legitimate use, and claimed ignorance of the diversion of funds sent to suppliers.

Moreover, the verdict on the theft count precludes a conclusion that the jury simply resolved the credibility contest against defendant and accepted the prosecution's case in its entirety. Count two of the indictment charged defendant with grand theft. The jury was instructed to consider only the circumstances surrounding the dumbwaiter for this count. The uncontradicted evidence was that defendant received a payment of $4,000, part of which was for the dumbwaiter, and the dumbwaiter cost $1,700. Thus, the issue for the jury was whether defendant committed theft, not the amount. Nonetheless, the jury convicted defendant of only petty theft. This strange result, especially when coupled with the long deliberation and the initial impasse, may reflect a compromise verdict. In any event, it indicates not all jurors accepted the prosecution's case completely. Since we cannot find beyond a reasonable doubt that the jury would have reached the same result if it had been instructed with CALJIC No. 17.01, the failure to so instruct was not harmless.

Because we must reverse due to this instructional error, we need not address defendant's other contentions.

The judgment is reversed

Blease, Acting, P. J., and Brown, J., concurred.