Filed 6/18/15  P. v. Bradder Ca2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROSS ALAN BRADDER,<br><br>    Defendant and Appellant. | B254835<br><br>(Los Angeles County<br>Super. Ct. No. BA380684) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bob S. Bowers, Judge.  Reversed.

Stanley Dale Radtke, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Jason Tran and Jonathan J. Kline, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant Ross Alan Bradder was convicted by jury of one count of embezzlement and acquitted on six counts of forgery. The jury rejected the special allegations seeking sentencing enhancements for taking property worth more than $200,000 or, alternatively, $65,000. On appeal from his embezzlement conviction, defendant contends the trial court erred in failing to give two jury instructions sua sponte: a unanimity instruction regarding the multiple acts which allegedly constituted embezzlement and an instruction regarding the statute of limitations. We find the failure to give a unanimity instruction under the circumstances of this case was prejudicial error. We therefore reverse the judgment.

## FACTUAL AND PROCEDURAL HISTORY

### I. Procedural Background

Defendant was charged by information with one count of embezzlement (Pen. Code, §504 (count 1))[1] and six counts of forgery (§470, subd. (a) (counts 2 through 7)). The information further specially alleged as to count one that defendant took property with a value exceeding $200,000 (§12022.6, subd. (a)(2)) or, alternatively, $100,000 (1203.045, subd. (a)).[2]

After a six day trial, the jury found defendant guilty of embezzlement on count one. The jury found defendant not guilty on all six forgery counts and found both of the special allegations on count one not true. On March 7, 2014, the court sentenced defendant to 364 days in prison, with the execution of that sentence suspended, and placed defendant on three years formal probation. The court further assessed various fines, including $43,000 in restitution to the victim. (§1202.4, sub. (f).) Defendant

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     The information alleged the lesser enhancement was "a theft of over $100,000, within the meaning of Penal Code section 1203.045(a)." Ultimately, as reflected in the jury instructions and verdict form, the amount of the lesser enhancement was alleged to be $65,000 pursuant to section 12022.6, subdivision (a)(1).

timely appealed.

## II. Prosecution Case

### A. Creation of Los Angeles Community Builders, Inc.

The Church on the Way (the Church) is a large church located in Van Nuys, California. During at least the last decade, the Church held seven to eight services each week "in a variety of languages," generated an income of about 16 million a year, and owned a radio station, university, and "a number of other organizations." In 2002, the Church began an outreach organization called Los Angeles Community Builders, Inc. (LACBI). LACBI's mission was to help the surrounding community by providing counseling and tutoring to students, revitalizing rundown houses and other facilities, providing food for community members in need, and organizing other community activities. The Church had engaged in some of these activities in the past, but created LACBI as a separate, nonprofit organization that received its support through donations.

Defendant "was the impetus behind" the creation of LACBI and was therefore installed as its founding president. James Tolle, who served as the Church's senior pastor for much of the period at issue, became the founding Chairman of LACBI's board of directors; other Church members made up the remainder of the board. Defendant was LACBI's "sole employee" but his salary was paid by the Church. Defendant ran the day to day operation of LACBI, including raising funds and organizing events. Defendant was given "a fair degree of independence in the sense that he was to manage the daily details" of LACBI, but he worked under the oversight of the LACBI board and was required to provide financial reports. Defendant "was to report to [Tolle] as the Chairman and to the Vice Chairman and to the Treasurer," Louis Eksteen.[3]

LACBI was formally incorporated in March 2002. LACBI's bylaws and articles of incorporation required that all checks issued by LACBI contain two signatures. LACBI operated using its own Bank of America bank account. Defendant was also

---

[3] Eksteen was also the Church's Chief Financial Officer.

issued a LACBI credit card. In the "rare" instance that defendant would need to use his own funds for a LACBI expense, the Church had a form he could fill out to be reimbursed. But the Church "frowned on" the use of personal finances for Church or LACBI operations. The Church also had a "petty cash system" that required documentation. As such, according to Tolle, it would be "highly unusual" for defendant to need to write checks to cash for LACBI operations; the Church "didn't operate that way" because "you can't track any of the monies being used."

B. *The Church Investigation*

From its inception in 2002 until early 2008, defendant was responsible for LACBI's financial accounting, which was handled independently from the Church. In early 2008, the Church decided to integrate LACBI's finances into the Church's finance department. As part of that process, Jeff Nelson, the Church's finance director, took control over LACBI's Bank of America bank account, the only LACBI account of which he was then aware. Nelson also requested that defendant provide him with bank account statements and any other documents related to LACBI's expenses, so that he "could do, in a sense, an in-house audit" as part of the transition. Defendant was resistant to Nelson's "multiple requests" for the financial documents. He eventually supplied incomplete records, and for certain months failed to provide the bank statement and copies of cancelled checks.

Sometime in early 2009, Nelson was trying to finalize payments to vendors for a LACBI event sponsored by an outside group, the Four Square Foundation. When he realized there were insufficient funds in LACBI's account, he contacted the Four Square Foundation about the status of a "significant" grant it had promised to LACBI for the event. Nelson was told the check had been deposited into an account at Mission Valley Bank. Until that point, Nelson was not aware of any LACBI account at Mission Valley Bank. Nelson then informed his superiors of the existence of the account.

When Tolle learned of the Mission Valley Bank account, he was concerned for the Church's reputation and the tax implications of any financial mismanagement of LACBI.

4

Tolle asked Eksteen, John Farmer (the Church's executive director), and Vip Bhola (the Church's general counsel) to "find out what was going on."

In March 2009, Eksteen, Farmer, and Bhola met with defendant. Defendant stated that he had placed the Four Square Foundation grant into the Mission Valley Bank account "for convenience" after "some type of delay" with the grant, and that he had planned to transfer the funds to the Church "later on." Defendant also claimed that the board had approved the opening of the Mission Valley Bank account and that he had opened it "for ease of funds, to better distribute if he needed quick cash" for LACBI activities. Farmer testified that defendant acknowledged that he "shouldn't have opened this account without letting [Farmer] know or working through the board" and promised to bring in all of the bank statements for that account the next day.

Bhola subsequently obtained directly from Mission Valley Bank copies of the documents defendant had used to open the account. When confronted with these documents, defendant admitted he had forged the signatures of Tolle and another LACBI board member on the documents without authorization.

Bhola testified that as they tried to verify what defendant had said during their meetings, they discovered that "some things were not true;" further, defendant's story would change from meeting to meeting. As a result, they decided to create written statements based on the meetings, "so that maybe the solemnity of having to put something in writing and sign it would cause him to tell us the truth." Bhola created a template for a declaration under penalty of perjury. According to Bhola, as defendant spoke at a meeting, Eksteen would type what he said. Defendant was then given the opportunity to review and amend or correct the declaration at the meeting, and he would then sign the document.

Over the course of several months in 2009, defendant met multiple times with Eksteen, Farmer, and Bhola and signed about 14 declarations. Bhola testified about additional information discovered by the Church during its investigation, discussed with defendant during the meetings, and memorialized in his declarations, including: (1)

5

Defendant admitted he forged Tolle's signature on a number of checks from LACBI's Bank of America account. Tolle also identified several checks that bore his signature but that he did not sign. (2) Defendant deposited $7,000 into the Mission Valley account, noting on the deposit slip that the funds came from his wife's mother. Defendant admitted this was untrue, that the funds actually came from another grant, and that he had never disclosed the existence of the grant to the Church. (3) Defendant deposited $30,000 into the Mission Valley account and represented that the money came from "Mr. Bullion," a previous employer who owed him money. Defendant admitted the money was actually a grant from the Buckman Charitable Foundation. (4) Defendant admitted that he opened a second Bank of America account without knowledge or approval of the LACBI board. He deposited donor funds into that account. Defendant stated that he opened the account because the Church was "implementing increasing control" over LACBI's original bank account and defendant wanted to "circumvent those controls." He closed the second account when the Church began banking online, because he feared the Church would discover the existence of the second account. He then opened the Mission Valley account. (5) Defendant admitted that he signed a $500 check each month from a LACBI account payable to cash and that the amount was "over and above legitimate reimbursements" due to him. He also mislabeled multiple petty cash disbursements of about $150 each as ministry expenses when they were actually for personal use. (6) Defendant set up an automatic debit from the original LACBI Bank of America account for his personal gym membership, labeling the withdrawal as "dues." (7) Defendant prepared checks that appeared to be tithes or donations to other organizations, obtained approval from the Church for the donations, and then redirected the funds for his own benefit, including a $1,000 check intended for San Fernando Valley Rescue Mission on August 10, 2008. (8) Using funds from the Mission Valley account, defendant, among other things: purchased a Honda minivan for his family for $24,000; paid off a credit loan for a personal vehicle in the amount of $6,754.89; paid for a trip for his family to Hawaii in the amount of approximately $4,700; and paid a personal trainer

6

$1,119. None of these expenses was authorized by the Church.[4] (9) Defendant told Bhola that a sponsor had dropped out and he needed to raise $7,500 for the annual Thanksgiving dinner for the homeless. Bhola secured the funds for the dinner himself. Defendant later admitted that the sponsor had not dropped out, he did not need the money for the dinner, and he had put the entire amount into the Mission Valley account.

### C. Sheriff's Department Investigation

In late 2009, the Church made a formal complaint regarding defendant to the Los Angeles County Sheriff's Department (LASD). In December 2009, LASD Detective David Lingscheidt was assigned to investigate. Detective Lingscheidt executed a search warrant on defendant's residence on January 7, 2010. In a car parked in defendant's driveway, the detective found a handwritten letter addressed to "Pastor Jim" (Tolle). The letter stated "Pastor Jim, I stole money and used it for my own purposes."

Detective Lingscheidt also executed search warrants for the LACBI records at Bank of America and Mission Valley Bank and conducted an analysis of those records. He testified that defendant wrote $188,529.15 in checks to "cash" from the original LACBI Bank of America account between March 10, 2003 and September 26, 2007, $16,375 in checks to "cash" from the second Bank of America account between October 11, 2007 and February 19, 2008, and $162,250 in checks to "cash" from the Mission Valley Bank account between February 22, 2008 and June 5, 2009.[5] He asked defendant for documentation confirming defendant's statement that "the vast majority of these cash disbursements" were for LACBI expenses. Defendant provided a 14-page report "summarizing the disbursements that he felt were related to the ministry" but did not provide any receipts or other documentation. Detective Lingscheidt testified that he had

---

[4]     Defendant confirmed that he made these purchases without authorization using funds from the Mission Valley account during his testimony at trial.

[5]     The date ranges for the second and third accounts reflect the entire period those accounts were open.

no other way to tell which of these disbursements was for a legitimate LACBI expense versus for defendant's personal use.

### D. *Interviews with Defendant*

Detective Lingscheidt interviewed defendant on January 7, 2010 during the search of defendant's residence. During the interview, defendant acknowledged LACBI's two-signature check policy. He stated that while he initially followed the policy, he ceased doing so in 2003, after the death of the senior pastor (Scott Bauer) caused "a considerable amount" of "upheaval in the Church" and made it difficult for him to obtain the second signature. Defendant began writing single-signature checks to petty cash for small vendors who were due small amounts of money. Defendant stated he was "acting as a lone ranger at the ministry" as a result of the "upheaval and the change in pastors."

Defendant also told Detective Lingscheidt that in 2007, he opened the second LACBI bank account at Bank of America. He stated he intended to use the account for special projects, such as fundraisers, and did not want to use the original LACBI bank account because he was "frustrated with the people and the Church." The second account was opened without authorization from LACBI's board. Defendant later opened an additional bank account at Mission Valley Bank, again without authorization. Defendant admitted to forging documents and Church officials' signatures in order to create that account.

Defendant stated he initially deposited $175,000 from LACBI grants and donations into the Mission Valley account. He later transferred about $150,000 of that money to the original Bank of America account so that the Mission Valley account would not be discovered by the Church. According to Detective Lingscheidt, defendant stated he wanted to keep the Mission Valley account secret because "he was using some of the money for his own personal use." Defendant admitted that his actions were "unethical, illegal and wrong in every way." He estimated he had used about $25,000 in LACBI funds for his personal use. Defendant claimed that he sold the Honda minivan and gave

8

the cash back to the Church as an attempt at restitution, and also "turned in his 401(k) account."

Defendant met with Detective Lingscheidt again on June 14, 2010 to discuss the analysis of the bank records. Defendant stated that some of the Mission Valley disbursements were valid ministry expenses, but admitted that between $70,000 and $80,000 of the funds were for his personal use.

## III. Defense

Defendant testified on his own behalf. He stated that he had a "vision" in 2001 to develop LACBI and then met with a pastor at the Church who assisted the defendant in establishing LACBI. He claimed that he paid for some Church and LACBI expenses with his own funds and was never reimbursed. He testified that he made checks out to "cash" when he paid multiple vendors for an event, as he never had another authorized signer with him at the time. That was his "common standard practice" "virtually" from 2003 when LACBI started doing events. He did not keep track of what payments he made in this fashion, stating that "managing money is not my thing." He did not fill out expense reports because LACBI did not have an expense policy. He would "on a weekly basis" take board members, donors, and staff members out to lunch and would pay for that expense with his personal credit card. Defendant stated he did not receive a LACBI credit card until "probably closer to 2007."

Defendant also claimed he used the minivan to transport "people and things" to LACBI events. He thought it was a "necessary expense for the need that existed," since he and his family were driving "all over Southern California" for LACBI-related events. He opened the second Bank of America account and the Mission Valley account because he was unhappy that "there was a mission for the ministry that was being circumvented and being not fulfilled because of the control that was being placed on it by the Church." When questioned about the trip for his family to Hawaii, defendant responded that "it would be something that would not necessarily be beyond the scope of a bonus compensation." Defendant claimed he did not steal any money from LACBI.

9

Defendant testified the declarations he signed during the 2009 meetings with Church officials were not accurate, but he signed them because church officials also stated it was mandatory for him to sign the declarations as a condition of "restoration" to both the Church and his position at LACBI, and he did not pay "attention to the detail of words that were necessarily used" in the declarations. He was also "directed" to write the letter to Tolle. In addition, defendant testified that he signed a power of attorney giving the Church control over all of his assets.

On cross-examination, defendant admitting signing Tolle's name on checks and signing LACBI board members' names on the documents setting up the Mission Valley account, all without the knowledge or permission of the board. He testified that during the church's investigation, he provided deposit slips that misidentified the source of the deposited funds.

## DISCUSSION

Defendant contends the trial court's failure to give a unanimity instruction on the embezzlement count constituted prejudicial error. We agree.

### A. *Legal Principles*

We review an assertion of instructional error de novo. (See *People v. Shaw* (2002) 97 Cal.App.4th 833, 838.) Whether the trial court should have given a "particular instruction in any particular case entails the resolution of a mixed question of law and fact," which is "predominantly legal." (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) As such, it should be examined without deference. (*Ibid*.)

In a criminal case, a jury verdict must be unanimous. (*People v. Collins* (1976) 17 Cal.3d 687, 693; Cal. Const., art. I, § 16.) This means that each individual juror must agree the defendant committed a specific offense. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) Therefore, when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes, or the trial court must instruct the jury sua sponte that it is required to unanimously agree on the same criminal act. (*People v. Riel* (2000) 22 Cal.4th 1153, 1199.)

10

A unanimity instruction "'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.'" (*Russo, supra*, 25 Cal.4th at p. 1132, quoting *People v. Sutherland* (1993) 17 Cal.App.4th 602, 612.) Similarly, the instruction is "'designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done something sufficient to convict on one count.'" (*Russo, supra*, 25 Cal.4th at p. 1132.)

*B. The Trial Court's Failure to Give a Unanimity Instruction Sua Sponte Was Error*

Defendant contends that the prosecution argued he committed several discrete acts, any one of which the jury could have relied upon to convict him of embezzlement. Because the prosecutor did not elect to proceed on one specific act, defendant contends the trial court had a sua sponte duty to give a unanimity instruction. The Attorney General counters that the continuous course of conduct exception applies to the facts here. We conclude that this case does not fall within the exception and therefore the trial court should have given a unanimity instruction.

A "narrow" exception to the rule requiring a unanimity instruction has developed over the years. (*People v. Gunn* (1987) 197 Cal.App.3d 408, 412 (*Gunn*); *People v. Madden* (1981) 116 Cal.App.3d 212, 218 [exception "quite limited"].) The "continuous course of conduct exception" is actually a "conglomerate" category comprised of several different types of situations. (*People v. Diedrich* (1982) 31 Cal.3d 263, 282.) As potentially applicable here, the first situation arises where the statute defining the crime "'contemplates a continuous course of conduct of a series of acts over a period of time. [Citation.]'" (*People v. Gunn*, *supra*, 197 Cal.App.3d at p. 412, quoting *People v. Thompson* (1984) 160 Cal.App.3d 220, 224.) This exception is "applied to varying crimes that cover 'repetitive or continuous conduct' such as child abuse; misdemeanor child annoyance or molestation; pimping; pandering; failure to provide for a minor child;

11

contributing to the delinquency of a minor; and dissuading a witness from testifying."
(*People v. Jenkins* (1994) 29 Cal.App.4th 287, 299-300 [citations omitted] [applying exception to torture]; see also *People v. Thompson*, *supra*, 160 Cal.App.3d at p. 223 [applying exception to spousal battering because, "[l]ike child abuse, this is a case where each individual act may not amount to a crime, but the cumulative outcome is criminal."].)

The Attorney General suggests that embezzlement falls within this category, as its "statutory scheme . . . evinces a legislative intent to punish a course of conduct rather than discrete events." But it cites no cases applying this exception to embezzlement, or to any other form of theft. Moreover, it acknowledges that the statute defining embezzlement[6] does not bear the standard indicia of an intent to punish a course of conduct—specifically, the statute does not "focus[] on a goal or effect of an offense, rather than the means," and the gravamen of the offense does not lie "in its cumulative effect," as is true of the offenses above. (*People v. Sanchez* (2001) 94 Cal.App.4th 622, 632.)

Instead, the cases considering the necessity of a unanimity instruction for embezzlement and similar offenses have looked to whether the facts of that particular case fall within a second subset of the continuing course of conduct exception, "when the acts are so closely connected that they form part of one and the same transaction, and thus one offense. [Citation.]" (*Gunn*, *supra*, 197 Cal.App.3d at p. 412.) In applying this exception, courts often assess whether defendant engaged in a course of conduct "with a single fraudulent intent." (*People v. Daniel* (1983) 145 Cal.App.3d 168, 175 (*Daniel*) [no instruction required where defendant "engaged in a continuous course of conduct of theft from a single victim over a period of five months with a single fraudulent intent or objective"]; *People v. Howes* (1950) 99 Cal.App.2d 808, 821 [no instruction required where defendant convicted of grand theft as his "various acts . . . were all motivated,

---

[6]    Embezzlement is defined as the "fraudulent appropriation of property by a person to whom it has been [en]trusted." (§ 503.)

generally, 'by one design, one purpose, [and] one impulse' [citation]".) It is similarly significant whether defendant has offered "essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them. [Citation.]" (*People v. Thompson* (1995) 36 Cal.App.4th 843, 851 (*Thompson*).) In *Thompson*, for example, a building contractor was convicted of diversion of construction funds through various means, including overbilling the client and applying the excess to other accounts; accepting money for, then failing to purchase, a requested dumbwaiter; and taking money for personal use. (*Ibid*.) In finding that an unanimity instruction was required, the court of appeal noted that the defendant had raised several different defenses for his conduct, including that "he did not know the amounts paid to suppliers were misapplied; he used the dumbwaiter funds for another legitimate use; and he was entitled to his personal draws" from the client's funds. (*Id*. at p. 852.) As such, the "different defenses raised the problem the unanimity instruction was designed to prevent," as some jurors could have believed one defense but rejected another, while other jurors could have reached the opposite conclusion. (*Ibid*.) "Absent a unanimity instruction, the jurors could have unanimously convicted defendant of diversion without agreeing on what he did." (*Ibid*.)

Similarly, here, the prosecution presented evidence of several different acts, any one of which could have supported the embezzlement charge against defendant if believed by the jury, including: (1) defendant's purchase of a Honda minivan for his family with LACBI funds; (2) his payment of "bonuses" to himself out of LACBI funds, such as a family vacation to Hawaii, paying off a car loan, gym membership, et cetera; (3) his purported admission to Detective Lingscheidt that he took a certain amount of LACBI money for his own personal use; and (4) writing over $200,000 worth of checks to "cash" out of the three LACBI accounts, with little to no supporting documentation. The prosecution alleged that defendant's conduct occurred "between April 1, 2003 and June 1, 2009" and argued each of these acts to the jury in support of the embezzlement charge. At trial, defendant denied committing any theft and offered several defenses: (1)

13

he claimed the minivan was a "necessary" expense because his work with LACBI involved extensive travel; (2) he classified the trip to Hawaii as "bonus compensation"; (3) he claimed that some of the admissions made in his declarations were false and were made at the direction of the Church so that he would be "restored" to his position; and (4) he stated that he wrote many checks to cash as part of his "standard practice" and then used those funds for legitimate LACBI expenses, such as paying event vendors. Thus, the jurors could have found defendant guilty without agreeing on which acts he committed and which defenses they believed.

The Attorney General suggests that all of defendant's "explanations were essentially based on the same defense that his use of the money was authorized." While the defenses raised here were certainly similar, they were not identical, and they provided the jury with a "rational basis" to distinguish between them. (*Thompson, supra*, 36 Cal.App.4th at p. 853.) For example, some jurors might have believed defendant's testimony regarding his legitimate use of checks written to "cash," but rejected his claim that he believed he was owed a vacation as a "bonus," while others might have reached the opposite conclusion.

The jury's rejection of both sentencing enhancements further supports our conclusion. This was not a case "where the jury's verdict implies that it did not believe the only defense offered." (*People v. Diedrich, supra*, 31 Cal.3d at p. 283.) Rather, the jury found that defendant committed embezzlement only as to the base amount of a taking over $950, but rejected the allegations that defendant embezzled more than $65,000, or alternatively, more than $200,000. That result suggests that the jury did not find beyond a reasonable doubt that defendant committed all of the acts of embezzlement alleged by the prosecution, nor did they accept or reject all of defendant's defenses.[7]

---

[7] By contrast, the Attorney General cites several cases where the jury's finding regarding the dollar amount of the theft actually supports application of the continuing course of conduct exception in those cases. For example, in *Daniel*, the jury found that defendant stole property in excess of $25,000. (*Daniel, supra*, 145 Cal.App.3d at p. 175.) Because each of the individual acts alleged was under $25,000, the "jury must have

14

Because they may not have unanimously agreed which act or acts defendant committed, the unanimity instruction should have been given.

### C. The Error Was Prejudicial

There is a split of opinion in the appellate courts as to the proper standard to apply when reviewing a claim of prejudicial error in a unanimity instruction case. (See *People v. Hernandez* (2013) 217 Cal.App.4th 559, 576 (*Hernandez*) [discussing split].) The majority of the courts that have addressed the issue have applied the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (See, e.g., *Hernandez, supra,* 217 Cal.App.4th at p. 576; *People v. Wolfe* (2003) 114 Cal.App.4th 177, 187-188 (*Wolfe*); *People v. Smith* (2005) 132 Cal.App.4th 1537, 1545; *People v. Deletto* (1983) 147 Cal.App.3d 458, 472.) As the court in *Wolfe* explained, "[w]hen the trial court erroneously fails to give a unanimity instruction, it allows a conviction even if all 12 jurors (as required by state law) are not convinced that the defendant is guilty of any one criminal event (as defined by state law). This lowers the prosecution's burden of proof and therefore violates federal constitutional law." (*Wolfe, supra*, 114 Cal.App.4th at pp. 187-188.) Where the error violates federal constitutional rights, the *Chapman* standard applies. (*Id*. at p. 188; but see *People v. Vargas* (2001) 91 Cal.App.4th 506, 562 [applying standard under *People v. Watson* (1956) 46 Cal.2d 818, 836, because "the question of whether defendant was entitled to a unanimity instruction is a state, not a federal, issue"].)

---

concluded" that defendant "did indeed engage in a continuous course of conduct." (*Ibid*.) Courts have reached similar results where several acts of petty theft make up a single charge of grand theft, and the defendant's conviction for grand theft therefore reflects the jury's acceptance of the entire course of conduct exception. (See, e.g., *People v. Howes, supra,* 99 Cal.App.2d at p. 820.) Indeed, in *Daniel*, the court of appeal found that the unanimity instruction *should* have been given on a second count of grand theft, where the jury found the enhancement allegation to be not true and therefore must have agreed that only one of two alleged takings had been proven. (*Daniel*, *supra*, 145 Cal.App.3d at p. 175.)

We agree that the *Chapman* standard is appropriate here. Under *Chapman*, the failure to give a unanimity instruction is harmless "[w]here the record provides no rational basis, by way of argument or evidence, for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that [the] defendant committed all acts if he committed any . . ." (*Thompson*, *supra*, 36 Cal.App.4th at p. 853; see also *People v. Jones* (1990) 51 Cal.3d 294, 307 (harmless error where "the record indicate[s] the jury resolved the basic credibility dispute against the defendant and therefore would have convicted [him] of any of the various offenses shown by the evidence".)

We cannot say this is such a case. As discussed above, the different defenses raised here gave the jury a rational basis to distinguish among the various alleged acts of embezzlement. Moreover, the jury's rejection of the sentencing enhancements and acquittal of defendant on the forgery counts preclude a conclusion that the jurors resolved the credibility contest against defendant and accepted the prosecution's case in its entirety. Thus, because we cannot find beyond a reasonable doubt that the jury would have reached the same result if it had been given a unanimity instruction, the failure to so instruct was prejudicial.[8]

Because we reverse due to this instructional error, we need not address defendant's argument regarding the statute of limitations.

---

[8] For the same reason, the error would be prejudicial under the *Watson* standard of review, as the jury's rejection of some of the prosecution's case means "it is reasonably probable that a result more favorable" to defendant would have been reached if the unanimity instruction had been given.

16

**DISPOSITION**

The judgment is reversed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

WILLHITE, Acting P. J.

MANELLA, J.

17