Filed 7/21/22  P. v. Colby CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C091199 |
| v. | (Super. Ct. No. CRF143983) |
| MARY ELIZABETH COLBY, | |
| Defendant and Appellant. | |

A jury convicted Mary Elizabeth Colby, a former employee of the Washington Unified School District (District), of misappropriation of public monies, keeping a false account, fraudulently altering or falsifying an account, and grand theft, all in connection with the taking of cash deposits.  The jury found that the value of the property taken

1

exceeded $950. The trial court suspended imposition of the sentence and placed defendant on probation for five years.

Defendant now contends (1) the trial court should have instructed sua sponte on unanimity because counts 1 through 4 could be based on several acts and the prosecutor did not select a specific act upon which each count was based; (2) the expert witness testimony from Patrick DeLangis lacked foundation and included inadmissible case-specific hearsay, and if this contention is forfeited for failure to object, her counsel was ineffective; and (3) cumulative prejudice requires reversal of the convictions.

We conclude (1) there was no instructional error on counts 1 and 4, and although the trial court should have given a unanimity instruction on counts 2 and 3, the error was harmless; (2) defendant forfeited her challenges to the expert testimony, and she fails to establish ineffective assistance; and (3) there is no cumulative prejudice.

We will affirm the judgment.

BACKGROUND

Defendant worked with Scott Lantsberger and Doris Earl at the District. Lantsberger was the District's assistant superintendent of business services and oversaw fiscal and other services. Defendant was Lantsberger's administrative assistant. Among other things, she generated and sent out invoices for the rental of District facilities. Although it was not her responsibility to distribute mail, defendant regularly opened and distributed office mail. Earl, the District's bookkeeper, logged facility-rental invoices into QSS, the District's primary financial electronic system, and was responsible for collecting monies due and making deposits, including filling out deposit slips and stamping the backs of checks to be deposited.

It was Earl's and not defendant's responsibility to make deposits at the bank. But defendant frequently volunteered to make deposits for Earl. According to Earl, the only other person who made bank deposits was Earl's supervisor, Kilee Lane; Lane made deposits for Earl about once every five months.

2

Earl expected defendant to go directly to the bank when she entrusted defendant with the deposit bag. Earl did not keep deposits in her desk and she did not anticipate that defendant would do so. Earl also did not expect that defendant would go through deposits or check that deposit slips were accurate. Earl said that was not defendant's job. Defendant never told Earl that Earl had filled out a deposit slip incorrectly or that checks were not stamped properly. Earl testified that the only time defendant would change a deposit slip was if Earl's calculations were incorrect and the bank teller caught the error; in that circumstance, defendant would have to change and initial the deposit slip. Otherwise, there was no reason for defendant to change a deposit slip. And there was no reason for defendant to have access to the District's deposit slips.

Nevertheless, a book of deposit slips was found in defendant's desk. In addition, Earl identified deposit slips for the District's account that were written by defendant. Earl also identified endorsements on the backs of checks deposited into the District's account that were written in defendant's hand.

According to Lantsberger, checks deposited in the District's account were stamped with a deposit-only stamp that identified the District as the account holder and the District's account number. Earl testified she never handwrote an endorsement on the back of a check. She said there was an address stamp on the back of a check deposited into the District's account that was not her deposit-only stamp. Similar address stamps were found in defendant's office.

Lantsberger and the District superintendent met with defendant on June 24, 2013 about her personal use of the District's postage meter. District employees were not allowed to use the District's postage meter for personal items. Defendant admitted she took postage strips home to mail merchandise she sold on eBay. She told Lantsberger she paid for the postage.

There was an invoice dated May 24, 2013 from the District to defendant for $155 for postage used in March through May 2013. At trial defendant admitted she created

3

that invoice. An automated log for invoices showed that the invoice was entered or modified on June 24, 2013 (the date of defendant's meeting with Lantsberger and the superintendent), even though the invoice was dated May 24, 2013. Defendant told Lantsberger that in preparing the postage invoice, she rounded up the amounts due instead of using exact amounts; she said that was a common practice at the District. Lantsberger denied it was a practice, and other invoices for postage did not reflect a practice of rounding up. The postage invoice to defendant was stamped "PAID 06/28/2013."

In late 2013, Earl contacted Portside Montessori School about a past due invoice. She was told the invoice had been paid, and she obtained a copy of Portside Montessori School's deposited check. She saw that defendant had hand-endorsed the check. Earl reported her finding to Lane.

The District's attorneys hired a forensic accountant to investigate the Portside Montessori School check and to determine whether there were discrepancies in deposits. Patrick DeLangis, a forensic accountant for over 25 years, was tasked with the investigation. The District gave DeLangis access to QuickBooks, which defendant used to create facility-rental invoices, and QSS and bank records.

West Sacramento Police Department Officer Erik Thruelsen interviewed defendant on May 23, 2014. Defendant claimed she did not pick up the mail at the District. She admitted taking deposits to the bank but said everyone did that. She said Earl made mistakes on deposit slips and forgot to stamp the back of checks, and defendant covered for Earl so that Earl would not get in trouble. Defendant admitted she sometimes kept deposits Earl gave her in an unlocked desk drawer and on occasion, she did not make deposits for weeks. She said when she delayed making a deposit, she amended the deposit slip with a new date. Also sometimes Earl or other employees would bring additional payments to her and ask her to add those to the deposit.

4

Defendant said it was common knowledge that she kept the deposit bag in her desk and other employees may have taken items from the deposit bag or switched out items.

DeLangis testified as a forensic accounting expert for the People at the trial. He testified that he focused on 21 deposit transactions and was able to trace cash payments using the District's records. He examined how deposit slips and cash were handled and who had access to the deposits between the time Earl prepared the deposit slips and when deposits were made at the bank. DeLangis concluded that defendant was the last person to have access to cash deposits because she took the deposits to the bank. DeLangis found discrepancies in most of the 21 deposit transactions he looked at in that there was less cash actually deposited than shown in the original deposit slips. He estimated that about 20 to 25 checks were replaced for cash.

DeLangis compared two deposit slips for October 25, 2012 in People's Exhibit 13. The first deposit slip showed a deposit of $3,093 in currency, $9 in coins and $140 in checks. The second deposit slip showed the total amount of cash deposited decreased by $566 and the total amount of checks deposited increased by $566. Earl had testified that she wrote the first deposit slip in Exhibit 13 and the second deposit slip in that exhibit was written by defendant. Earl also testified that defendant hand-endorsed a $566 check in that exhibit.

DeLangis also testified about People's Exhibit 24. The first deposit slip in that exhibit was dated June 13, 2013, and included a total deposit amount of $1,175 with three checks totaling $28. The second deposit slip showed a deposit made June 28, 2013, totaling $1,174.25, including the three checks shown in the first deposit slip. DeLangis testified that the first deposit slip showed a deposit of $1,148 in cash but the second deposit slip showed a deposit of only $6.26 in cash. Earl had testified that she wrote the first deposit slip and defendant wrote the second deposit slip. People's Exhibit 24 included the deposited Portside Montessori School check. Earl testified that the handwritten endorsements on the backs of three checks in this deposit, including the one

from Portside Montessori School, were by defendant. Earl said the stamp on the back of another check in this deposit was not Earl's deposit-only stamp.

DeLangis determined from bank records that during the period July 2012 to October 2013, a total of $16,028.82 in cash was not deposited. He opined there was no chance the shortage was a result of arithmetic errors because the amount of cash deposited was reduced in an amount equal to a check or checks added to the deposit. Based on records of annual facility-rental revenue and the records for the 21 bank deposits he focused on, DeLangis determined there was a decline in annual facility-rental revenue from 2009-2010 through October 2013. He estimated the decline in revenue was in excess of $60,000.

Defense witness Corinna Macias was a fiscal analyst for the District. She testified that different people in the office accepted check and cash payments. Macias put payments she received in the District office safe. She recalled that she and Cruz Duran performed some of Earl's duties when Earl was out of the office, and defendant might have taken over some of Earl's duties. Macias said defendant opened the mail sometimes. Macias said Earl, defendant, Macias and Lane were the only people who made deposits at the bank and Macias made bank deposits only a couple of times over the years she worked with Earl. Macias said she did not use the District's postage meter to send out personal packages and was not aware of anyone who used the District's postage meter for personal packages.

Defendant testified at trial. She said she did not steal money from the District, substitute checks and steal cash from deposits, or falsify documents. She thought someone was taking money from the District, but it wasn't her.

Contrary to her statement to Officer Thruelsen, defendant testified that she picked up mail at the office many times, but she said anyone who was up front could pick up the mail. Defendant claimed Macias took over invoicing at some point. She said Macias simply forgot during the trial that she (Macias) sent out invoices for facility rentals.

6

Defendant admitted she made frequent bank runs during the period July 2012 to October 2013. She admitted keeping deposits in her desk for days and weeks at a time and said Lantsberger, Lane, and Earl knew she kept deposits in her office overnight. There was no lock on her desk and office door.

Defendant identified her writing on certain deposit slips presented at the trial. She said she prepared new deposit slips because she made deposits weeks after Earl gave them to her and she fixed mistakes in the deposit slips prepared by Earl. She said she stamped the backs of checks using an address stamp if Earl did not stamp them, and the bank required her to hand-endorse checks that were not stamped.

With regard to the postage invoice, defendant admitted telling a detective that everyone used the postage meter for personal packages. She said at trial Earl forgot that defendant used the postage meter for personal purposes and Macias also forgot that people used the District's postage meter for personal packages. Defendant said she created the postage invoice in May 2013 and was not in the office when the postage invoice was accessed in QuickBooks on June 24, 2013.

The jury convicted defendant of misappropriation of public monies (Pen. Code, § 424, subd. (a)(1) -- count 1), keeping a false account (§ 424, subd. (a)(3) -- count 2), fraudulently altering or falsifying an account (§ 424, subd. (a)(4) -- count 3), and grand theft (§ 484, subd. (a) -- count 4), and found true the allegation that the value of the property taken exceeded $950.[1] The trial court suspended imposition of the sentence and placed defendant on probation for five years subject to various conditions, including serving 120 days in county jail.

_____

[1] Undesignated statutory references are to the Penal Code.

DISCUSSION

I

Defendant contends the trial court should have instructed sua sponte on unanimity because counts 1 through 4 could be based on several acts and the prosecutor did not select a specific act for each count.

There was no discussion between counsel and the trial court about a unanimity instruction in the record. As a general rule, when a violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relies or the trial court must instruct the jury to agree on which act to base a conviction. (*People v. Jennings* (2010) 50 Cal.4th 616, 679.) When no election is made by the People, the trial court has a duty to instruct sua sponte on unanimity. (*People v. Curry* (2007) 158 Cal.App.4th 766, 783.) However, a unanimity instruction is not required if the case falls within the continuous course of conduct exception, "which arises 'when the acts are so closely connected in time as to form part of one transaction' . . . . There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime." (*Jennings*, at p. 679.)

Counts 1 and 4 were based on a course of conduct. Count 1 alleged that defendant misappropriated public monies in violation of section 424, subdivision (a)(1). The crime of misappropriation of public monies may be based on a course of conduct. (See *People v. Selivanov* (2016) 5 Cal.App.5th 726, 751-754.) Count 4 alleged that defendant willfully stole personal property with a value exceeding $950, in violation of sections 484, subdivision (a) and 487, subdivision (a). A single count of grand theft may be based on several acts of taking done pursuant to a single plan. (*People v. Bailey* (1961) 55 Cal.2d 514, 518-520; *People v. Daniel* (1983) 145 Cal.App.3d 168, 175; *People v. Robertson* (1959) 167 Cal.App.2d 571, 576-577.)

8

The prosecutor argued to the jury that defendant stole over $16,000 from the District, using facility-rental checks to cover for cash taken from deposits during the period July 1, 2012 to October 31, 2013. He characterized what defendant did as "a scheme" under which defendant controlled invoicing, had access to the mail, deposits, and deposit slips, and took advantage of Earl's trust. In discussing the act or acts upon which count 1 was based, the prosecutor argued to the jury that defendant took an aggregate sum of over $16,000. He told the jury that count 4 was a "sort of catchall as it relates to Count 1" and argued that defendant took over $16,000 from deposits.

Defendant offered different defenses to the alleged misappropriation and theft. For example, her trial counsel argued to the jury that other employees also made deposits, there was no video showing defendant making the deposits, and anyone could have accessed the unlocked desk where defendant kept deposits. But the defenses were directed to all the deposit transactions.[2] The course of conduct exception to the unanimity requirement applies to counts 1 and 4 because the acts alleged are closely connected and defendant tendered all of the same defenses to the acts such that there was no reasonable basis for the jury to distinguish between them. (*People v. Crandell* (1988) 46 Cal.3d 833, 875.) Defendant's claim as to counts 1 and 4 lacks merit.

However, defendant's claim as to counts 2 and 3 has some merit. Count 2 alleged that defendant kept a false account in that she was charged with the receipt and safekeeping of public monies and willfully and knowingly kept a false account or made a false entry or erasure in an account, in violation of section 424, subdivision (a)(3). The prosecutor argued that count 2 was based on two types of acts: (1) defendant backdating the postage invoice dated May 24, 2013, and making it look like that invoice had been

---

[2] Defendant contends there was some evidence that starting in June 2013, Macias was responsible for facility rentals. The portions of the record defendant cites do not support her factual assertion.

9

paid in full on May 24, 2013, when it had not; and (2) deposit slips defendant wrote that listed less cash and more checks than the original deposit slips prepared by Earl. Defendant offered defenses to the postage-invoice allegation that were different from her defenses to the deposit-transaction allegations.

Count 3 alleged that defendant was charged with the receipt and safekeeping of public monies and fraudulently altered, falsified, or concealed an account, in violation of section 424, subdivision (a)(4). The prosecutor argued defendant was guilty of the crime alleged in count 3 by committing two types of acts: (1) falsifying or fraudulently altering deposit slips, and (2) concealing invoices. With regard to the latter act, the prosecutor argued defendant did not send Earl copies of invoices so that no one at the District would track when payments on those invoices would be received and no one at the District would call about missing payments.

The trial court should have sua sponte instructed on unanimity for counts 2 and 3 because the prosecutor argued two types of acts constituted the charged crimes and the evidence presented a risk that the jury may divide as to which act constituted the charged offense. (*People v. Diedrich* (1982) 31 Cal.3d 263, 280-281; *People v. Hernandez* (2013) 217 Cal.App.4th 559, 569-571.) Most courts, including ours, apply the *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] standard for harmless error in a unanimity instruction case. (*Hernandez*, at p. 576; *People v. Curry, supra*, 158 Cal.App.4th at p. 783; *People v. Smith* (2005) 132 Cal.App.4th 1537, 1545; *People v. Deletto* (1983) 147 Cal.App.3d 458, 472.) We conclude that no reversal is required under that standard.

The prosecutor told the jury that on counts 2 and 3, the jury must agree on which document defendant made a false entry. Earl offered compelling evidence that defendant wrote certain deposit slips admitted into evidence. She said some of those deposit slips showed that defendant changed the amount of cash to be deposited as less than stated in the original deposit slip prepared by Earl, although the total amount of the deposit was

10

the same or nearly the same; and in certain deposits where the amount of currency being deposited was reduced, defendant endorsed the back of some checks by hand, contrary to Earl's practice.

Defendant denied substituting checks and stealing cash from deposits and falsifying documents. But the jury discredited defendant's testimony, returning its verdicts in less than two and a half hours without submitting any questions or requesting a readback and convicting defendant on all counts. In convicting defendant on counts 1 and 4, which are based on taking cash from bank deposits, the jury accepted the prosecutor's theory that defendant replaced cash deposits with checks for the equivalent or similar amount, altered or created new deposit slips, and took cash that should have been deposited in the District's account. The jury could not have made contrary findings in the count 2 and 3 charges based on the same conduct relating to bank deposits. "Where the record indicates the jury resolved the basic credibility dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence, the failure to give the unanimity instruction is harmless." (*People v. Thompson* (1995) 36 Cal.App.4th 843, 853; see *People v. Deletto, supra*, 147 Cal.App.3d at p. 473.)

II

Defendant also urges that DeLangis' testimony lacked foundation and included inadmissible case-specific hearsay.

A

In response to defendant's in limine motion to prevent DeLangis from testifying about hearsay unless all preliminary facts had been established through direct testimony, the trial court ruled that DeLangis could testify about case-specific hearsay if competent evidence established the asserted fact. The trial court said it would have to see what facts were established through other witnesses and defendant's trial counsel could object if he believed DeLangis was testifying about case-specific facts that had not been established

11

through another witness. Defendant did not object to, and the trial court admitted, a number of copies of deposit slips and checks that are in the record on appeal. Defendant's trial counsel also did not object when DeLangis gave the testimony defendant now challenges. The failure to object to admission of expert opinion testimony or hearsay at trial forfeits an appellate claim that such evidence was improperly admitted. (Evid. Code, § 353, subd. (a); *People v. Stevens* (2015) 62 Cal.4th 325, 333.)

Anticipating a claim of forfeiture, defendant argues his trial counsel rendered ineffective assistance by failing to object.

To establish ineffective assistance of counsel, a defendant must prove (1) that trial counsel's representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficiency resulted in prejudice to the defendant. (*People v. Maury* (2003) 30 Cal.4th 342, 389; *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693] (*Strickland*).) If a defendant makes an insufficient showing on either of those components, his ineffective assistance claim fails. (*People v. Holt* (1997) 15 Cal.4th 619, 703; *Strickland*, at p. 687.)

We review trial counsel's performance with deferential scrutiny, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and recognizing the many choices that attorneys make in handling cases and the danger of second-guessing an attorney's decisions. (*People v. Maury, supra*, 30 Cal.4th at p. 389; *Strickland, supra*, 466 U.S. at p. 689.) "It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

The record is silent about why defendant's trial counsel did not object to the testimony by DeLangis that defendant now challenges. Defendant's trial counsel may have elected to create an argument for reasonable doubt by eliciting testimony that other employees took over certain duties and had access to deposits. Defense counsel may also have elected to create an argument that there were deficiencies in DeLangis' investigation. We accord " 'great deference to [defense trial] counsel's tactical choices' " (*People v. Mickel* (2016) 2 Cal.5th 181, 198) and have no basis upon which to determine that trial counsel's representation was deficient.

Defendant also fails to establish prejudice. She complains that DeLangis relied on case-specific facts not admitted into evidence or otherwise proven by competent evidence to form his opinion about missing cash and fraud. But an expert witness may rely on hearsay in forming an opinion and tell the jury in general terms that he or she did so. (*People v. Sanchez* (2016) 63 Cal.4th 665, 685 (*Sanchez*).) It is proper for an expert witness to rely on hearsay in forming an opinion as long as the expert does not recite the contents of the hearsay evidence. (*People v. Garton* (2018) 4 Cal.5th 485, 505-506 (*Garton*).)

An expert witness may not relate case-specific facts based on hearsay to support his or her opinion, unless the hearsay evidence is admitted through an applicable hearsay exception or the case-specific fact is independently proven by competent evidence in which case the expert may assume its truth in a hypothetical. (*Sanchez, supra*, 63 Cal.4th at pp. 684, 686.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id.* at p. 676.) Testimony reciting case-specific facts from hearsay evidence is subject to exclusion on hearsay grounds. (*People v. Veamatahau* (2020) 9 Cal.5th 16, 26.)

DeLangis opined, based on his review of hearsay evidence including deposit slips, that defendant took $16,028.82 from cash deposits and the District's facility-rental revenue declined more than $60,000 starting with the 2009-2010 school year. Such

13

testimony was permissible because it only conveyed in general terms that DeLangis relied on hearsay evidence. (*Garton, supra*, 4 Cal.5th at p. 507; *Sanchez, supra*, 63 Cal.4th at p. 685.) In *Garton*, the California Supreme Court rejected a challenge to expert opinion testimony by a coroner about bullet trajectory, fetus viability, and cause of death based on her review of the prior coroner's autopsy report and diagrams and photographs taken at the autopsy and crime scene. (*Garton*, at pp. 504, 506-507.) In contrast, the expert's recitation of statements made by the prior coroner in his autopsy report related hearsay and was impermissible. (*Id.* at p. 506; see also *People v. Turner* (2020) 10 Cal.5th 786, 818, 821-823.) DeLangis did not relate the contents of hearsay evidence in the portions of the record cited by defendant. He only gave his conclusions about cash deposit shortages and revenue loss based on his review of the District's records.

Even if it was error to admit testimony that $16,028.82 was taken from the District's cash deposits and there was a loss of revenue of at least $60,000 because such testimony related inadmissible hearsay, no prejudice resulted to defendant. (*People v. Turner, supra*, 10 Cal.5th at pp. 823, 825 [applying *People v. Watson* (1956) 46 Cal.2d 818 prejudice test for state law error in the admission of hearsay].) Defendant's trial counsel elicited testimony about the same opinions from DeLangis during cross-examination. Further, defendant did not dispute that someone stole money from the District. She only claimed that she did not do it. And in his closing argument to the jury, defendant's trial counsel did not argue that the amount stolen was something other than $16,028.82. He also did not dispute in his closing remarks to the jury that revenue from facility rentals had declined or that there was a loss of revenue of at least $60,000.

Additionally, defendant admitted she delayed making deposits Earl had given her for weeks on occasion. Earl's testimony and the copies of deposit slips and checks admitted into evidence established that defendant wrote deposit slips reflecting less cash was deposited than stated in the original deposit slips prepared by Earl. A book of

14

deposit slips was found in defendant's desk. Earl said there was no reason for defendant to have deposit slips for the District or to prepare an entirely different deposit slip for the deposits Earl entrusted to defendant. Earl identified defendant's handwriting on certain endorsed checks included in deposits. She said defendant opened the mail and could have held checks that came in, waited for cash deposits that matched the amount of the check, took out the cash from the deposit and replaced it with checks. Earl said defendant was the only person who could have gotten the checks Earl had testified about. Defendant fails to show that she would have obtained a more favorable result had DeLangis not opined about the total amount of cash deposit shortage and revenue loss.

B

Defendant further contends the People did not lay an adequate foundation for admission of some of the materials on which DeLangis relied as business records or official records and that some of the documents DeLangis considered were hearsay, without specifying what those documents are. The claim is forfeited because it is made without citation to the record and in a conclusory fashion. (*Okasaki v. City of Elk Grove* (2012) 203 Cal.App.4th 1043, 1045, fn. 1; *Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 656 ["It is the appellant's responsibility to support claims of error with citation and authority; this court is not obligated to perform that function on the appellant's behalf"]; *Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 743; *Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856.)

III

Defendant also claims that cumulative prejudice caused by the asserted errors requires us to reverse her convictions because it denied her the due process right to a fundamentally fair and reliable trial.

"[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) Defendant has not demonstrated a series of trial

15

errors or that she did not receive due process and a fair trial.  We reject her claim of cumulative prejudice.

DISPOSITION

The judgment is affirmed.


                                                   /S/
                                          MAURO, Acting P. J.


We concur:


         /S/
HOCH, J.


         /S/
KRAUSE, J.

16