Filed 1/8/26  P. v. Doucet CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RYAN MICHAEL DOUCET,<br><br>        Defendant and Appellant. | A170327<br><br>(Humboldt County Super. Ct. No. CR2300962-A) |

In April of 2023, a search of defendant Ryan Michael Doucet's residence revealed two assault rifles as well as four homemade explosive devices. Doucet went to trial on 11 counts arising out of the search, pleaded guilty to five of them after the close of evidence, and was then found guilty of five of the other six, including being a felon in possession of a firearm, possession of an assault weapon, possession of an assault weapon for sale, child endangerment, possession of an explosive device, and possession of the ingredients to make an explosive device.  The trial court subsequently sentenced him to 14 years in prison.

Doucet appeals, arguing that his sentence on two of the firearm possession convictions and one of the explosive convictions should have been imposed and stayed pursuant to Penal Code[1] section 654—an argument with

---

[1]        Further undesignated statutory references are to the Penal Code.

1

which the Attorney General agrees—and that the trial court erred in failing to give a unanimity instruction with respect to the child endangerment count. We agree with the parties that the three sentences at issue should have been stayed under section 654, and exercise our authority to modify the judgment accordingly. We otherwise affirm.

## BACKGROUND

On September 20, 2022, in Humboldt County Superior Court, Doucet pleaded guilty to possession of methamphetamine for sale (Health & Saf. Code, § 11378) (No. CR2202468). On October 18, he was placed on two years formal probation.

**The Searches**

On April 1, 2023, Detective Brian Buihner and Deputy Sheriff Jonathan Waxler, along with two other members of the Humboldt County Sheriff's Department, conducted a search of Doucet's residence on Garden Lane in Bayside. Detective Buihner described the residence as a "single-width mobile home trailer attached to a more permanent wooden structure" with a roof, and "a raised, wooden patio." Outside, Detective Buihner found "clutter and trash everywhere," including "bikes, power tools, . . . refrigerators, freezers, [and] power cables." After announcing themselves, Detective Buihner and Deputy Waxler were let into the residence by Doucet's wife, Kathleen Ellis, who was inside with the couple's son, John Doe.[2]

Detective Buihner described the interior of the residence as "[e]xtremely dirty," with "clutter [and] trash everywhere," including "cables all over the ground" and a "floorboard [that] was broken." Directly across from the front door, he observed an "open[] wooden cabinet" approximately

---

[2] Detective Buihner testified that John Doe was six years old, while Deputy Waxler testified that Doe was "around seven years old."

2

three feet tall, in which he located eight "4-by-5[] zip-top baggies," five of which contained a substance he believed to be fentanyl. On a desk next to the cabinet was a working digital scale with "multiple different powdery residue[s] on top of it." Another deputy located $1,191 in cash in a pair of coveralls hanging on the front door.

Deputy Waxler likewise found what he described as "fairly hazardous conditions" in Doucet's residence, including "power tools laying about," "copious amounts of trash buildup," "mold, animal feces," and "several five-gallon buckets" that appeared as though "they were being utilized as latrines or toilets." He also observed drugs and drug paraphernalia "in plain view." On the only mattress in the main bedroom—which Deputy Waxler testified was shared by Doucet, Ellis, and Doe—he observed "piles of boxes and clothing, trash," drug paraphernalia, and drugs, in particular, "fentanyl and methamphetamine."

Deputy Waxler measured John Doe's height at four feet, one inch tall. Doe's hair was "unkempt," "tattered and messy," and the deputy "couldn't even estimate the last time it had been washed or cleaned." Doe also appeared to have "an infection on his thumb."

Doucet was placed under arrest. After a search of his cellphone revealed information suggesting that there was more evidence at his property that the deputies had not located—including text messages from March of 2023 in which Doucet indicated that he "ha[d] three ghost ARs" and could "make legit dynamite"—the deputies returned to Doucet's property that same evening to conduct a further search. This time, on the shoulder of the road approximately 50 feet from the house, they located a "U-haul style truck" that "looked like it hadn't been driven in some time" but had a "brand new lock on it." After cutting the lock, the deputies found inside "[m]ultiple soft

shell rifle cases"; "multiple ammo cans full of different calibers of ammunition," including high-capacity magazines and "tracer rounds" (i.e., bullets whose tip "burns or creates a flare effect so that the shooter can see where the projectile is going"); two silencers; two completed firearms, a "Bushmaster AR-15" and a "Ruger Mini-14"; three "partially completed" AR-style rifles; "body armor"; a "ballistic helmet"; a plastic container with "roughly half a pound" of fentanyl inside; and items they "believed were being used for bomb-making," including "hard, cylindrical cardboard tubes." Deputy Waxler placed a call to the bomb squad.

Deputy Sheriff Luke Mathieson, a certified hazardous explosives device technician, responded to the call and examined the materials on a blanket at the scene. There he found four "M-type devices" (a cardboard tube that is filled with "pyrotechnics, flash powder or other explosive materials to create basically, a large firecracker"); as well as tubes, plugs, "a couple rolls of . . . cannon . . . or hobby fuse"; fine dust aluminum powder ("used as a sensitizer for explosives" to make them "burn hotter and create[] a bigger explosion"); and iron oxide (for "coloring effect"). Whereas a normal consumer firecracker contains 50 milligrams of flash powder, the cardboard tubes containing the four M-type devices were "full" and could hold 30 grams (or 30,000 milligrams) of flash powder each, the equivalent of a quarter stick of dynamite. However, according to testing performed by Deputy Mathieson, the M-type devices had been mixed incorrectly and would not have functioned as explosives.

**The Charges**

On September 15, 2023, the District Attorney filed an information charging Doucet with two counts of possession of an explosive device (§ 18710, subd. (a)), to wit, "explosives" and "tracer rounds" (counts 1 and 2);

4

possession of ingredients to make an explosive device (§ 18720) (count 3); felony child endangerment, together with Kathleen Ellis (§ 273a, subd. (a)) (count 4); felon in possession of a firearm with a prior, "to wit, an AR-10 rifle, a purple AR-15 rifle, and a blue AR-15 rifle with short barrels, bolt assembly, and charging handles" (§ 29800, subd. (a)(1)) (count 5); possession of an assault weapon, based on the same firearms described in count 5 (§ 30605, subd. (a)) (count 6); felon in possession of ammunition (§ 30305, subd. (a)(1)) (count 7); possession of a silencer (§ 33410) (count 8); possession of an assault weapon for sale, "to wit, assault style rifles" (§ 30600, subd. (a)) (count 9); possession of fentanyl for sale (Health & Saf. Code, § 11351) (count 10); and possession of a large-capacity magazine (§ 32310, subd. (a)) (count 11).[3]

**The Trial**

Doucet was tried by jury on November 15 and 16, 2023. Detective Buihner, Deputy Waxler, and Deputy Mathieson testified, some of which testimony is described above. Doucet testified in his own defense as follows. He had lived at the residence on Garden Lane with Kathleen Ellis and John Doe for "roughly" seven years. However, around April 1, 2023, Kathleen Ellis "was moving out" and her "dad ha[d] been in town for the last few weeks and they [had] been staying over in Valley West in a hotel." They had been gone from the house for "[a] week solid and before that, off and on for another

---

[3] The information further alleged several aggravating factors under section 1170, subdivision (b)(2), including that "the defendant was convicted of other crimes for which consecutive sentences could have been imposed [and] for which concurrent sentences are being imposed; the manner in which the crime was carried out indicates planning, sophistication, or professionalism; the crime involved a large quantity of contraband; the defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness; [and] the defendant was on probation, mandatory supervision, post-release community supervision, or parole when the crime was committed."

week."  The night before April 1, Doucet "got home late" because he was cutting firewood until "2:00, 3:00 in the morning."  He had his own door to the residence, with a "separate room from them, separate side of the house," so he "went in and went to sleep."  He did not realize that that Ellis and John Doe were in the residence until the next day, when he saw "on the camera" the arrival of police officers, went outside, and saw his father-in-law's van.

Although there was no formal custody arrangement, Doucet testified that Kathleen Ellis "pretty much . . . raised" and "raises" John Doe, although he was an "active as a father in his life."

Doucet answered, "Yes" when asked if he would describe himself "as an addict," with his "drug of choice" being fentanyl, which he had been using, along with methamphetamine, for the past two years.  Before that, he used "heroin, Suboxone and crystal meth, probably, off and on, since I moved out here, like, nine years ago."

Although Doucet knew that he was not permitted to possess firearms after his conviction for selling methamphetamine, he had been in possession of certain firearms for four years, and he "stored them locked away in the box truck" after his conviction because he knew they were "valuable."  He had received his tax return of "5,000-something" dollars two weeks before April 1, which he used to purchase the almost half a pound of fentanyl found in the box truck.  When asked how he would explain his behavior and judgments that led to the charges against him, Doucet answered that "use of drugs, you know, definitely played a part," and that fentanyl is "lousy" and "makes you an addict."

Doucet admitted that everything in the box truck was his, but claimed that what Deputy Waxler had described as two silencers were an "oil filter" and a "Maglite."  He denied any intention to make destructive devices,

6

indicating that he instead intended to make "M-80s or cherry bombs"—"big firecrackers for fireworks for the 4th of July"—which he acknowledged "may have been illegal" in California. He was not aware that the ingredients for the "fireworks" could be used to make destructive devices, "wasn't trying to destruct anything," and had "no intentions of bombs for sure."

**The Plea, Verdict, and Sentence**

On November 16, after the close of evidence but before the jury was instructed and closing arguments began, Doucet entered a plea of guilty to counts 5, 6, 7, 9, and 11.[4]

The next day, the jury found Doucet guilty on counts 1, 2, 3, 4, and 10, and not guilty on count 8.

On April 11, 2024, the trial court sentenced Doucet to an aggregate term of 14 years in prison, comprised as follows: the upper term of 8 years on count 9 (§ 30600), which the trial court designated as the base term; the upper term of three years on count 1; 8 months on count 2 (§ 18710); one year (one-third the middle term of three years) on count 3 (§ 18720); 16 months (one-third the middle term of four years) on count 4 (§ 273a); the upper term of three years on count 5 (§ 29800, subd. (a)(1)); 8 months (one-third the middle term of two years) each on counts 6 (§ 30605) and count 7 (§ 30305; one year (one-third the middle term of three years) on count 10 (Health & Saf. Code, § 11351); and eight months (one-third the middle term of two years) on count 11. The sentence on each count was to run consecutively to count 9, except for count 1 (as to which "concurrent sentencing is appropriate" because it involved "essentially, the same course of conduct,

---

[4] The abstract of judgment erroneously indicates that Doucet's conviction on count 11 was by jury and not by plea. We will order the abstract of judgment corrected. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185–187.)

7

which is alleged in Count Three"), count 5 (because "it's the same firearms that are alleged" in count 6), and count 11 ("based on the convictions for ammunition, the firearms and the other charges that Mr. Doucet has been convicted of").

The trial court also revoked probation in Case No. CR2202468 and imposed a sentence of 8 months (one-third the middle term of two years) for Doucet's 2022 conviction for possession of methamphetamine for sale (Health & Saf. Code, § 11378).

Doucet filed a notice of appeal.

## DISCUSSION

**Section 654 Requires that the Sentence on Counts 1, 5, and 6 Be Stayed**

### Counts 5, 6, and 9

Doucet argues that his sentence violates the prohibition on multiple punishment set forth in section 654 in two ways: first, his sentences for being a felon in possession of a firearm, possession of an assault weapon, and possession of an assault weapon for sale (counts 5, 6, & 9) were each based on his possession of the same firearms; and second, because the M-type devices were not capable of exploding, his sentences for possession of a destructive device and possession of ingredients to make a destructive device (counts 1 & 3) were based on the same conduct. The Attorney General concedes both arguments and agrees that the sentences imposed on counts 1, 5, and 9 must be stayed under section 654. We agree with the parties.

Section 654, subdivision (a) provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective. [Citations.] We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single 'intent and objective' or multiple intents and objectives." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.)

" ' "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor." . . . [¶] "Whether the facts and circumstances reveal a single intent and objective within the meaning of Penal Code section 654 is generally a factual matter; the dimension and meaning of section 654 is a legal question." ' (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1414.) 'When a trial court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, the trial court is deemed to have made an implied finding each offense had a separate objective.' (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.) We review for substantial evidence a trial court's implied finding that a defendant had separate intents and objectives for different offenses. (*Dowdell*, at p. 1414.)" (*In re L.J.* (2021) 72 Cal.App.5th 37, 43.)

Doucet's sentences on each of counts 5, 6, and 9 were based on his simultaneous possession of two completed assault rifles, and we assume that such possession can constitute two physical acts for the purposes of section 654. (See *People v. Jones* (2012) 54 Cal.4th 350, 358 (*Jones*) [suggesting

9

" 'simultaneous possession of different items of contraband' " are separate acts for purposes of section 654].)  Even so, multiple punishment can be imposed consistent with section 654—on two of the three counts[5]—only if substantial evidence in the record supports an implied finding that he had a " 'separate objective' " in possessing one firearm versus the other.  (*In re L.J.*, *supra*, 72 Cal.App.5th at p. 43.)  Our review of the record reveals no such evidence.  Instead, Doucet testified that he kept both firearms because he knew they were "valuable" and that "when I was legally having them, they cost a lot of money.  So, I wasn't just trying to give them to somebody . . . for free."  Accordingly, Doucet's sentence on two of counts 5, 6, and 9 must be stayed pursuant to section 654.[6]

As noted, Doucet received an upper term sentence of 8 years on count 9—the principal term—a concurrent three-year sentence on count 5, and a consecutive eight month sentence on count 6.  Given that count 9 was the base term as to which the trial court imposed the upper term sentence, we think it clear that it would stay the sentences on counts 5 and 6 were we to remand for resentencing.  Accordingly, in the interests of judicial economy, and given that the parties agree on this remedy, we will modify the judgment

---

[5]    Under *Jones*, *supra*, 54 Cal.4th 350, "[s]ection 654 prohibits multiple punishment for a single physical act that violates different provisions of law." (*Jones*, p. 358.)

[6]    Indeed, at sentencing the prosecutor indicated, at least with respect to count 6, that "it would be incapsulated [*sic*] as being a part of Count Nine," and "when I had charged them, I had contemplated that . . . there were different guns for different aspects . . . but I don't know if . . . there was actually a distinction there.  So, I do believe that Count Six, in fairness, should be 352 to Count Nine, which would take eight months off of the sentence bringing it down by eight months."  In response to a question from the trial court, the prosecutor quickly clarified that by "352," he meant section 654.

to stay the sentences on counts 5 and 6 rather than remand for resentencing. (See § 1260 [authority to modify unauthorized sentence]; *People v. Burns* (1984) 158 Cal.App.3d 1178, 1184 ["staying execution of the penalty imposed" is the preferred remedy [for section 654 error] where the "reduction in sentence would be relatively minor" because "[i]n such cases, it would not serve the interests of justice or judicial economy to require remand"].)

**Counts 1 and 3**

Doucet's next argument is that section 654 prohibits multiple punishment for both possession of an explosive device (§ 18710, subd. (a)) (count 1) and possession of ingredients to make an explosive device (§ 18720) (count 3), because the "explosives" he possessed were not actually capable of exploding, and thus "identical evidence supported counts 1 and 3." The Attorney General concedes that "the convictions on counts 1 and 3 involve the same conduct," and that "the term on count 1 should be stayed instead of run concurrently." Again, we agree.

The jury instructions on count 3 defined an "explosive" as follows: "An *explosive* is any substance, or combination of substances, (1) whose main or common purpose is to detonate or rapidly combust and (2) which is capable of a relatively instantaneous or rapid release of gas and heat. [¶] An *explosive* is also any substance whose main purpose is to be combined with other substances to create a new substance that can release gas and heat rapidly or relatively instantaneously." In order to find Doucet guilty on count 1, the instructions required the jury to conclude that he knowingly possessed a "destructive device," defined as "[a]ny bomb, grenade, explosive, missile, or similar device," or (2) "[a]ny projectile containing any explosive or incendiary material or any other chemical substance, including but not limited to, that which is commonly known as tracer or incendiary ammunition, except tracer

11

ammunition manufactured for use in shotguns." (See CALCRIM No. 2570.) The instruction on counts 1 and 2 then indicated that the prosecution alleged Doucet possessed two "destructive devices": "1. Explosives" and "2. Tracer Rounds." With respect to count 3, the instructions required the prosecution to prove: "1. The defendant possessed a substance, material, or combination of substances and materials; [¶] AND [¶] 2. When the defendant possessed those items, he intended to make an explosive or a destructive device."[7]

Doucet argues that because the ingredients as he mixed them were not "capable of a relatively instantaneous or rapid release of gas and heat," the evidence supported "only the second definition of 'explosive,' i.e., any substance whose main purpose is to be combined with other substances to create a substance that can release gas and heat rapidly," and thus "identical evidence"—i.e., his possession of the ingredients with the intent to make an explosive or destructive device—supported both counts 1 and 3. He is correct.

Both counts 1 and 3 were based on Doucet's possession of the ingredients in the box truck, at the same time and place, and under the same circumstances. And again, rather than making any express or " 'implied finding' " that Doucet had " 'a separate objective' " (*In re L.J.*, *supra*, 72 Cal.App.5th at p. 43) with respect to counts 1 and 3, the trial court expressly acknowledged that both counts were based on "essentially, the same course of conduct," which explained its decision to run the sentence on count 1 concurrently.

---

[7] In his closing argument, the prosecutor explained that "[c]ount One refers to these four completed devices, the four M-type devices, that Deputy Mathieson talked about," and that count 3 was "pretty self-explanatory . . . Deputy Mathieson talked about it was all there. There were still fuses, the powder, it's in the same workshop in the box truck . . . ."

12

In any event, there is no substantial evidence in the record to support an implied finding that Doucet possessed the M-type devices and their ingredients with any "separate intent[] and objective." (*In re L.J.*, *supra*, 72 Cal.App.5th at p. 43.) As noted, he testified that he was intending to make "cherry bomb" firecrackers, while the prosecution argued, based on his text messages, that his intention was to sell the devices as "legit dynamite." But there was no evidence that he harbored any different intent with respect to the devices and their ingredients. The trial court therefore should have imposed and stayed sentence on one of counts 1 and 3 pursuant to section 654.

As noted, Doucet received a concurrent upper-term sentence of three years on count 1 and a consecutive one-year (one-third the middle term of three years) sentence on count 3. The parties agree that the proper remedy for the section 654 error is to stay the sentence on count 1. Given that the trial court imposed a concurrent sentence on count 1 because it involved "essentially, the same course of conduct" as count 3, and the fact that staying the sentence on count 1 will not change Doucet's aggregate sentence, we will exercise our authority to modify the judgment to stay the sentence on count 1 rather than remand for resentencing. (See § 1260; *People v. Alford* (2010) 180 Cal.App.4th 1463, 1473 [exercising authority to modify judgment to impose and stay sentence under section 654 rather than remand for resentencing "that will not change [defendant's] actual prison time"].)

**No Unanimity Instruction Was Required With Respect to the Child Endangerment Count**

Doucet's final argument is that the trial court erred in failing to give a unanimity instruction to the jury with respect to the child endangerment count. We disagree.

"In a criminal case, a jury verdict must be unanimous. [Citations.] . . . . Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.]

"This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.] . . . . 'The [unanimity] instruction is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count.' [Citation.]" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*); see *People v. McDaniel* (2021) 12 Cal.5th 97, 145.)

"There are, however, several exceptions to this rule. For example, no unanimity instruction is required if the case falls within the continuous-course-of-conduct exception,[8] which arises 'when the acts are so closely

---

8  In *People v. Leuth* (2012) 206 Cal.App.4th 189, the Court of Appeal observed that the " 'continuous-course-of-conduct exception' . . . is a catch-all term, which, somewhat confusingly, embraces two wholly distinct principles," and that with respect to the "exception" for closely connected acts that form one transaction, "it is not at all clear that this is truly an *exception*. It would

connected in time as to form part of one transaction' (*People v. Crandell* (1988) 46 Cal.3d 833, 875), or 'when . . . the statute contemplates a continuous course of conduct or a series of acts over a period of time.' (*People v. Thompson* (1984) 160 Cal.App.3d 220, 224.) There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime. (*People v. Carrera* (1989) 49 Cal.3d 291, 311–312.)" (*People v. Jennings* (2010) 50 Cal.4th 616, 679.)

"The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed her guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Russo, supra*, 25 Cal.4th at pp. 1134–1135.)

"Even absent a request, the court should give [a unanimity] instruction 'where the circumstances of the case so dictate.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1199, quoting *People v. Carrera, supra,* 49 Cal.3d at p. 311, fn.

---

seem more accurate to say that, in this situation, a unanimity instruction is required, but the failure to give one is harmless." (*Id*. at p. 196.)

8.)  And whether a jury has been properly instructed, including the question of whether the trial court should have given a unanimity instruction sua sponte, is a question of law that we review de novo.  (*People v. Fish* (2024) 102 Cal.App.5th 730, 741–742 (*Fish*); *People v. Hernandez* (2013) 217 Cal.App.4th 559, 568.)  In doing so, we consider " ' "whether there is a reasonable likelihood that the jury misunderstood and misapplied" ' " the law in light of the lack of instruction, considering both " ' "the entire charge of the court" ' " and " 'the arguments of counsel in assessing the probable impact' " of the lack of instruction on the jury.  (*Fish*, *supra*, 102 Cal.App.5th at pp. 742–743.)

Doucet argues that an instruction on unanimity was required on the child endangerment count because the prosecution relied on five "different types of harm" to support it, namely that:  (1) "the residence was generally filthy and unsanitary," (2) it "was in disrepair," (3) "John Doe's person reflected a lack of personal hygiene and medical care," (4) "fentanyl was accessible in the master bedroom and living room," and (5) "firearms and explosive materials were kept on the premises."  For the proposition that the prosecution relied on each of these circumstances in support of the child endangerment count, Doucet points to the prosecutor's statement during closing argument that "So, not only do we have a circumstance where the child has an active infection, that there are hazardous circumstances around the house, such as Detective Buihner testified to, a broken floorboard, power tools throughout the house, those kinds of things, that, in fact, there was fentanyl in the main first area of the home in a low cabinet, the top of the cabinet being about three feet tall."

The Attorney General responds that Doucet's conviction was "not supported by distinct, separate acts, but rather by a single course of

16

conduct—namely, allowing John Doe to live in a home under the conditions the officers observed"—and that "the conditions of the house were simply the myriad ways that proved the house was, in fact, dangerous," thus supporting "a single theory of crime." We agree with the Attorney General.

Section 273a, subdivision (a) punishes, as relevant here, "[a]ny person who, under circumstances or conditions likely to produce great bodily harm or death, . . . having the care or custody of any child, . . . willfully causes or permits that child to be placed in a situation where his or her person or health is endangered." And so the jury was instructed, pursuant to CALCRIM No. 821, that in order to find Doucet guilty of child endangerment, the prosecution had to prove that he, "while having care or custody of a child, willfully caused or permitted the child to be placed in a situation where the child's person or health was endangered," "under circumstances or conditions likely to produce great bodily harm or death," and that he "was criminally negligent" when he did so. (See CALCRIM No. 821; § 273a, subd. (a).)

Given the statute's language describing a singular "situation" presenting "circumstances or conditions likely to produce great bodily harm or death," the Attorney General has the better of the argument as to whether each of those conditions was a separate act of child endangerment. Moreover, we cannot accept Doucet's argument that a unanimity instruction was required for the more fundamental reason that we disagree with its premise, i.e., that the prosecution relied on each of the conditions described above to prove the child endangerment count.

Turning first to the "firearms and explosive materials . . . kept on the premises," the prosecutor's closing argument with respect to child endangerment made not a single mention of them, and as discussed, the evidence showed that they were locked in a box truck some 50 feet from the

17

residence, and were not capable of actually exploding. And there was neither argument nor evidence that the condition of the residence, or John Doe's "lack of personal hygiene and medical care," were "likely to produce great bodily injury or death." (§ 273a, subd. (a).) The single sentence of the prosecutor's closing argument relied on by Doucet, in which the prosecutor mentioned John Doe's "active infection" and the "hazardous circumstances" in the residence, goes on to note that "there was fentanyl in the main first area of the home in a low cabinet, the top of the cabinet being about three feet tall." The balance of the prosecutor's closing argument regarding child endangerment—an argument that spans some four pages of the reporter's transcript—concerned the easily-accessible fentanyl in the residence, including specific reference to Deputy Waxler's testimony that just two milligrams of fentanyl can be a fatal dose. And in his rebuttal, in response to defense counsel's argument that the condition of the residence and John Doe's infection did not present circumstances likely to produce great bodily injury or death, the prosecutor expressly told the jury that "it's not the People's argument that infection is going to kill [John Doe] or that he being unke[m]pt is going to kill him," which circumstances were "just indicators about what's happening in this house." Rather, the prosecutor argued that the circumstance likely to produce great bodily injury or death was that there was "fentanyl everywhere" in the house, including "in [John Doe's] bed," and that it was "logical . . . to go from fentanyl strewn about the residence to a child being harmed, to a child dying."

In short, this is not a case in which Doucet's conviction "could be based on two or more discrete criminal events," nor do we perceive any risk that the jury may have "divide[d]" without agreeing as to whether it was the disrepair of the residence, John Doe's infection and his personal hygiene, or the easily-

18

accessible fentanyl that presented the circumstances likely to produce great bodily injury or death necessary to sustain the child endangerment count. (*Russo*, *supra*, 25 Cal.4th at p. 1135.)  The evidence and the arguments of counsel show that the circumstance that could—and did—form the basis for the child endangerment count was the presence of what the evidence showed were at least five "4-by-5[] zip-top baggies" of fentanyl within arm's reach of John Doe throughout his home.

In any event, we conclude that the alleged error was harmless under any standard because Doucet "offer[ed] the same defense or defenses to the various acts constituting the charged crime."[9]  (*People v. Jennings*, *supra*, 50 Cal.4th at p. 679, citing *People v. Carrera*, *supra*, 49 Cal.3d at pp. 311–312.)  As noted, Doucet testified he was an "addict" with fentanyl his "drug of choice," admitted that the explosives in the box truck belonged to him, and did not dispute the state of his residence as law enforcement found it on April 1, 2023.  Instead, his defense focused on the element of child endangerment requiring that he "have care or custody of the child" and the mental state required to commit it, telling the jury that Ellis "raised" and "raises" John Doe, and that he was chopping firewood until late in the night before the deputies arrived on April 1 and did not know John Doe was present on the premises.  And in closing argument, after stating that he was "not condoning the condition of Mr. Doucet's residence" and acknowledging that "conditions

---

[9]     Recent decisions of this district have evaluated prejudice from failure to give a unanimity instruction under the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, although there appears to be a split of authority in the Courts of Appeal on this question. (See *People v. Smith* (2005) 132 Cal.App.4th 1537, 1545 & fn. 7; *People v. Jones* (2024) 106 Cal.App.5th 1085, 1096; *Fish*, *supra*, 102 Cal.App.5th at p. 738.)

19

were bad there," defense counsel argued that Doucet "didn't even know the child had come home that night before with Ms. Ellis," asked the jury to "look at the relative culpability of the people involved," and noted there was "testimony they were being evicted" and "that the child had been staying in a hotel room for the past several days with the maternal grandfather and mother."

Given that the jury evidently rejected these arguments—which depended in large part on Doucet's credibility—he offers no basis to conclude that the result would have been any different had the jury been given a unanimity instruction with respect to the child endangerment count. (See, e.g., *People v. Hernandez, supra*, 217 Cal.App.4th at p. 577 [where "the defendant offered the same defense to all criminal acts and 'the jury's verdict implies that it did not believe the only defense offered,' failure to give a unanimity instruction is harmless error"]; *People v. Thompson* (1995) 36 Cal.App.4th 843, 853 ["[w]here the record indicates the jury resolved the basic credibility dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence, the failure to give the unanimity instruction is harmless"].)

## DISPOSITION

The judgment is modified to stay the sentences on counts 1, 5, and 6 under Penal Code section 654. The trial court is directed to prepare an amended abstract of judgment reflecting these modifications, as well as the fact that defendant's conviction on count 11 was by plea and not by jury, and to forward a certified copy to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

20

_____

RICHMAN, J.

We concur.

_____

STEWART,  P. J.

_____

DESAUTELS, J.

(A170327N)